**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE GLUCAGON-LIKE PEPTIDE-1 RECEPTOR AGONISTS (GLP-1 RAS) NON-ARTERITIC ISCHEMIC OPTIC NEUROPATHY PRODUCTS LIABILITY LITIGATION | MDL NO. 3163<br><br>THIS DOCUMENT RELATES TO ALL CASES<br><br>JUDGE KAREN SPENCER MARSTON |
| WILLIAM ANDREW COVINGTON,<br><br>Plaintiff,<br>v.<br><br>NOVO NORDISK INC.,<br>NOVO NORDISK A/S,<br>ELI LILLY AND COMPANY INC.,<br><br>Defendants. | COMPLAINT & JURY DEMAND<br><br>CIVIL ACTION NO: 2:26-cv-08526 |

## DIRECT FILING ORDER AND VENUE

Plaintiff files this Complaint pursuant to the Direct Filing Order and is to be bound by the rights, protections, privileges, and obligations of the Direct Filing Order and other Orders of the Court. Further, in accordance with the Direct Filing Order, Plaintiff hereby designates the United States District Court for the Northern District of Georgia as Plaintiff's venue ("Original Venue"). Plaintiff makes this selection based upon one (or more) of the following factors (check the appropriate box(es)):

_X_ Plaintiff currently resides in Griffin, Georgia.

_X_ Plaintiff purchased and used Defendant(s)' products in Griffin, Georgia.

_X_ The Original Venue is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, specifically (28 U.S.C. § 1391(b)(2)).

## PARTIES

1. Plaintiff WILLIAM ANDREW COVINGTON is a citizen and resident of the State of Georgia.

2. Defendant Novo Nordisk Inc. ("Novo Nordisk") is a Delaware corporation that has its principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey 08536.

3. Defendant Novo Nordisk A/S is a public limited liability company organized under the laws of Denmark with its principal place of business in Bagsværd, Denmark.

4. Novo Nordisk Inc. and Novo Nordisk A/S will collectively be referred to as the "Novo Nordisk Defendants."

5. Defendant Eli Lilly and Company ("Eli Lilly") is an Indiana corporation with a principal place of business at 893 S. Delaware St., Indianapolis, Indiana.

6. Eli Lilly designed, researched, manufactured, tested, labeled, advertised, promoted, marketed, sold, and/or distributed Zepbound and is identified on its label.[1]

7. Upon information and belief, Defendants failed to warn the end users of Wegovy and Zepbound of the complications and devastating effects of which the companies knew or should have known.

8. Upon information and belief, Defendants' marketing was deceptive and misleading about the true risks associated with use of Wegovy and Zepbound, of which the companies knew or should have known.

## JURISDICTION

9. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) as the matter

---

[1] *See* Zepbound Label (Nov. 2023), available at https://www.accessdata.fda.gov/drugsatFDA_docs/label/2023/217806s000lbl.pdf.

in controversy exceeds the value of $75,000, exclusive of interest and costs, and is between citizens of different states and/or a foreign state, as Plaintiff is a citizen of the State of Georgia and each Defendant is neither incorporated nor has its principal place of business in the State of Georgia.

10. This Court has supplemental jurisdiction over the remaining common law and state law claims pursuant to 28 U.S.C. § 1367.

## BACKGROUND

### I. An Accidental Blockbuster: The Development of Ozempic and Wegovy

11. In the early 1990s, Novo Nordisk researchers discovered that when they injected into rats a chemical compound known as liraglutide—a GLP-1 (glucagon-like peptide-1) agonist—the drug caused the rats to stop eating almost entirely.[2]

12. GLP-1 agonists are a class of medications that can help lower blood sugar levels and promote weight loss.[3] An agonist is a manufactured substance that attaches to a cell receptor and causes the same action as the naturally occurring substance.[4] Thus, GLP-1 agonists work by mimicking a naturally occurring GLP-1 hormone.

13. To describe the process in other words, GLP-1 medications bind to GLP receptors to trigger the effects (or roles) of the GLP-1 hormone. The higher the dose of the GLP-1 agonist, the more extreme the effects.[5]

14. "These rats, they starved themselves," said one Novo Nordisk scientist, Lotte Bjerre Knudsen, in a video series released by the Novo Nordisk Foundation, "so we kind of knew there

---

[2] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy html (last visited Sept. 17, 2023)
[3] https://my.clevelandclinic.org/health/articles/13901-glp-1-agonists (last visited Sept. 17, 2023)
[4] *Id.*
[5] *Id.*

was something in some of these peptides that was really important for appetite regulation."[6]

15. Later testing in human subjects revealed that those who received an intravenous drip of GLP-1 agonist ate 12% less at a lunch buffet than those who got a placebo.[7]

16. Consequently, Novo Nordisk decided to study liraglutide as not only a diabetes drug which had been shown to lower blood sugars, but also as a drug to treat obesity.[8]

17. Years later, in 2010, liraglutide was approved for the treatment of diabetes by the FDA under Novo Nordisk's brand name Victoza,[9] at which point Novo Nordisk moved forward with studying the drug for weight loss.[10]

18. After clinical trials, in 2014 the FDA approved liraglutide for treatment of obesity under Novo Nordisk's brand name Saxenda as a daily injectable.[11]

19. Saxenda's effects on weight loss, however, were modest; patients lost about 5% of their weight.[12]

20. In an effort to find ways to make a longer-lasting GLP-1 agonist so patients would not have to inject themselves every day, Novo Nordisk created a new molecule with the chemical name semaglutide.[13]

21. Novo Nordisk branded semaglutide as Ozempic, and on December 5, 2016, the Novo Nordisk Defendants announced submission of Ozempic's new drug application (NDA) to the

---

[6] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy html (last visited Sept. 17, 2023).
[7] *Id.*
[8] *Id.*
[9] https://www ncbi.nlm.nih.gov/pmc/articles/PMC2957743/#:~:text=The%20incretin%20mimetic%20liraglutide%20(Victoza,adults%20with%20type%2D2%20diabetes.&text=Liraglutide%20is%20also%20approved%20in%20Europe%20and%20Japan (last visited Sept. 18, 2023).
[10] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy html (last visited Sept. 17, 2023).
[11] *Id.*
[12] *Id.*
[13] *Id.*

FDA for regulatory approval of a once-weekly injectable in 0.5 mg or 1 mg for treatment of Type 2 diabetes. In the announcement, Defendants represented that in clinical trials "once-weekly" Ozempic had a safe and well-tolerated profile, and Defendants represented that the most common adverse event was nausea.[14]

22. On December 5, 2017, the FDA approved the application and granted premarket approval as NDA 209637.[15]

23. In addition to diabetic control, Ozempic also caused 15% weight loss, which was three times the loss caused by its predecessor, Saxenda.[16]

24. Just one year after Ozempic's approval for diabetes, Defendants started a clinical trial in patients who were overweight or suffered from obesity.[17]

25. The results of the trial demonstrated that for participants who were overweight or obese, 2.4 mg of semaglutide once weekly plus lifestyle intervention was associated with sustained, clinically relevant reduction in body weight.[18]

26. Importantly, the trial data also pointed out that more participants in the semaglutide group than in the placebo group discontinued treatment owing to gastrointestinal events (59 [4.5%] vs. 5 [0.8%]).

27. By March of 2021, Defendants had completed the clinical trial studying semaglutide for weight loss, and its results were published March 18, 2021.[19]

28. In addition to the results, the published study, which was funded by Defendants,

---

[14] https://ml.globenewswire.com/Resource/Download/d2f719e1-d69f-4918-ae7e-48fc6b731183 (last visited Sept. 17, 2023).
[15] https://www.accessdata.fda.gov/Ozempicatfda_docs/appletter/2017/209637s000ltr.pdf (last visited Sept. 17, 2023).
[16] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy html (last visited Sept. 17, 2023).
[17] *Id.*
[18] https://www.nejm.org/doi/full/10.1056/NEJMoa2032183 (last visited Sept. 17, 2023)
[19] https://www.nejm.org/doi/full/10.1056/NEJMoa2032183 (last visited Sept. 17, 2023)

argued: "Obesity is a chronic disease and global public health challenge."[20]

29. On March 20, 2019, Defendant Novo Nordisk Inc. submitted a supplemental new drug application ("sNDA") for Ozempic 0.5 mg or 1 mg injection, requesting approval to expand its marketing of Ozempic by adding an indication to reduce the risk of major adverse cardiovascular events in adults with type 2 diabetes and established cardiovascular disease.[21] On January 16, 2020, the FDA approved this new indication.[22]

30. Then, on May 28, 2021, Defendant Novo Nordisk Inc. submitted another sNDA requesting approval for a higher 2 mg dose of Ozempic injection. On March 28, 2022, the FDA approved this request.[23]

31. In their press release, Defendants represented Ozempic as having "proven safety and efficacy" and they continued to advertise that "it can help many patients lose some weight."[24] As with its prior press releases, Defendants disclosed Important Safety Information and provided a link to the Medication Guide and Prescribing Information. However, severe gastrointestinal events, including gastroparesis and gastroenteritis, were not identified as risks.

32. On June 4, 2021, the FDA announced that Wegovy was approved for use in adults with obesity (BMI over 30) or overweight (BMI over 27) and at least one chronic health condition, [25]and was the first FDA approved drug for weight loss since 2014.[26]

---

[20] *Id.*
[21] https://www.prnewswire.com/news-releases/novo-nordisk-files-for-us-fda-approval-of-oral-semaglutide-for-blood-sugar-control-and-cardiovascular-risk-reduction-in-adults-with-type-2-diabetes-300815668.html (last visited on Sept. 17, 2023).
[22] https://www.accessdata.fda.gov/Ozempicatfda_docs/appletter/2020/209637Orig1s003ltr.pdf (last visited Sept. 17, 2023).
[23] https://www.accessdata.fda.gov/Ozempicatfda_docs/appletter/2022/209637Orig1s009ltr.pdf (last visited Sept. 17, 2023).
[24] https://www.prnewswire.com/news-releases/novo-nordisk-receives-fda-approval-of-higher-dose-ozempic-2-mg-providing-increased-glycemic-control-for-adults-with-type-2-diabetes-301512209.html (last visited Sept. 17, 2023).
[25] https://www.fda.gov/news-events/press-announcements/fda-approves-new-drug-treatment-chronic-weight-management-first-2014 (last accessed Sept. 17, 2023)
[26] *Id.*

33. Wegovy and Ozempic are chemically identical and primarily differ based upon dosage.

34. On December 23, 2022, Novo Nordisk announced FDA approval of Wegovy injection, along with reduced calorie meal plan and exercise, for the treatment of obesity in adolescents aged 12 years and older.[27]

## II. Novo Nordisk Defendants Create a Market: Millions Spent on Marketing and Promotion Create a Media Frenzy and Mega Seller

35. Conventionally, evidence-based approaches to obesity focused on lifestyle: eating whole, nutritious foods, exercising, reducing stress, and obtaining adequate sleep. In contrast, Defendants have spent millions of dollars marketing the belief that sustained weight loss is only achievable by using Defendants' medications at a cost of more than $1000 a month.

36. Throughout their marketing, Defendants fail to disclose the true serious side effects of Ozempic and/or Wegovy, including but not limited to hospitalization and death.

37. Defendants also fail to disclose in their label and patient brochure for Ozempic and/or Wegovy that in order to maintain any weight loss, the patient must stay on the drug permanently or most patients will regain most of the weight within one year and virtually all the weight will be regained within five years.[28]

38. When the Novo Nordisk Defendants announced that they had started selling Ozempic in the United States, they touted the medication as a "new treatment option[]" that "addresses the concerns and needs of people with diabetes[.]" The Novo Nordisk Defendants offered an "Instant Savings Card to reduce co-pays to as low as $25 per prescription fill for up to two years."

---

[27] https://www.novonordisk-us.com/media/news-archive/news-details html?id=151389 (last visited Sept. 17, 2023).
[28] https://www.cnbc.com/2023/03/29/people-taking-obesity-drugs-ozempic-and-wegovy-gain-weight-once-they-stop-medication html; https://pubmed ncbi.nlm.nih.gov/35441470/

39. Indeed, some patients will regain even more weight after stopping the drug, so that they end up heavier than before starting Ozempic and/or Wegovy.[29] This is also not disclosed in the label or patient brochure.

40. Novo Nordisk was not permitted to market Ozempic for weight loss without FDA approval for that specific indication,[30] but before Wegovy ever received separate approval for treatment of weight loss, Novo Nordisk had already begun mentioning weight loss in its Ozempic commercials.[31]

41. On July 30, 2018, the Novo Nordisk Defendants launched their first television ad for Ozempic to the tune of the 1970s hit pop song "Magic" by Pilot, wherein the Novo Nordisk Defendants advertised that "adults lost on average up to 14 pounds" when taking Ozempic.[32]




42. Over the next five years, the Novo Nordisk Defendants spent $884,000,000 on running television ads in the United States to promote its semaglutide drugs, Ozempic and Wegovy,

---

[29] https://www.cnbc.com/2023/03/29/people-taking-obesity-drugs-ozempic-and-wegovy-gain-weight-once-they-stop-medication html

[30] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy html (last visited Sept. 18, 2023).

[31] *Id.*

[32] https://www.ispot.tv/ad/d6Xz/ozempic-oh (last visited Sept. 18, 2023).

and another of its lesser-known GLP-1 agonists, Rybelsus, with most advertisements allocated towards Ozempic.[33]

43. By 2021, Defendants' aggressive marketing of the weight loss benefits of Ozempic, sophisticated use of social media, and America's socially ingrained desire to be thin had reached a tipping point.[34]

44. Defendants' aggressive marketing includes a number of different platforms, including over 4,000 marketing advertisements for Ozempic and similar weight-loss medications that have been placed on Facebook and Instagram.[35]

45. According to open payments data, Novo Nordisk spent $33,927,336.42 on marketing/consulting/travel/food and beverage/etc. to physicians in 2022 alone.[36]

46. For its two drugs approved specifically for obesity, Wegovy and Saxenda, Novo Nordisk has spent at least $25.8 million over the past decade to U.S. medical professionals to promote sales of the drug.[37]

47. Overall, at least 57 U.S. physicians each accepted at least $100,000 from Novo in payments associated with Wegovy or Saxenda over the past decade. A Reuters special report found these physicians were an influential group: Forty-one were obesity specialists who run weight-management clinics, work at academic hospitals, write obesity-treatment guidelines or hold top positions at medical societies.[38]

48. Dr. Donna Ryan, a Louisiana researcher and former president of The Obesity

[33] https://medwatch.com/News/Pharma Biotech/article15680727.ece (last visited Sept. 18, 2023).
[34] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy html (last visited Sept. 18, 2023).
[35] https://www.nbcnews.com/tech/internet/ozempic-weight-loss-drug-ads-instagram-wegovy-semaglutide-rcna88602 (last visited Sept. 18, 2023).
[36] https://openpaymentsdata.cms.gov/company/100000000144 (last visited Sept. 18, 2023).
[37] https://www.reuters.com/investigates/special-report/health-obesity-novonordisk-doctors/
[38] *Id.*

Society, has accepted more than $1 million from Novo over the last decade, including $600,691 related to Wegovy and Saxenda, the analysis found.[39] As reported in Reuters, Ryan was instrumental in persuading the U.S. Office of Personnel Management to cover Wegovy and similar drugs for millions of federal workers.[40]

49. On TikTok, the hashtag #Ozempic had 273 million views as of November 22, 2022,[41] and currently has over 1.2 billion views.[42]

50. The hashtag #wegovyweightloss has 163.2 million views as of September 9, 2023, on TikTok.

51. The hashtag #ozempicjourney has 199.5 million views, as of September 9, 2023, on TikTok.

52. Novo Nordisk partnered directly with Meta and Instagram to run marketing campaigns. One diabetes marketing campaign achieved a dramatic 28% direct engagement rate with their polls.[43] This was a lauded result presented in a case study by Meta.

53. On July 10, 2023, a global media company declared Ozempic as "2023's buzziest drug" and one of the "Hottest Brands, disrupting U.S. culture and industry."[44]

54. Novo Nordisk reportedly spent approximately one hundred million dollars advertising Ozempic last year.[45] Ozempic ranked as the sixth most advertised prescription drug brand in 2022, with a U.S. measured media spend of $181 million, according to Vivvix spending

[39] *Id*.
[40] *Id*.
[41] https://www.nytimes.com/2022/11/22/well/ozempic-diabetes-weight-loss html (last visited Sept. 18, 2023).
[42] https://www.tiktok.com/tag/ozempic (last visited on August 1, 2023).
[43] https://business.instagram.com/success/novo-nordisk (last visited Sept. 17, 2023).
[44] https://adage.com/article/special-report-hottest-brands/ozempic-hottest-brands-most-popular-marketing-2023/2500571 (last visited on Sept. 17, 2023).
[45] https://www.newyorker.com/magazine/2023/03/27/will-the-ozempic-era-change-how-we-think-about-being-fat-and-being-thin (last visited Sept. 17, 2023).

data and Pathmatics paid social data as reported in Ad Age Leading National Advertisers 2023.[46]

55. In 2023, over $491 million was spent advertising "diabesity" drugs, including Ozempic and Wegovy.[47]

56. Jimmy Kimmel joked about Ozempic at the Oscars.[48]

57. Howard Stern has joked and discussed Ozempic.[49] Interestingly, Stern notes that the "catchy" theme song "distracts" the listener from actually hearing any of the listed side effects.[50]

58. Both Elon Musk and Chelsea Handler are among the celebrities who have admitted to using the drug for weight loss.[51]

59. Novo Nordisk has partnered directly with other celebrities as paid spokespersons, including Queen Latifah.[52]

60. As part of overall campaigns to target Black, Brown, and Hispanic consumers with their marketing campaigns and social media partnerships with influencers, in addition to Queen Latifah, Novo Nordisk has compensated Yvette Nicole Brown to serve as a paid spokesperson.[53]

61. In 2021, Novo Nordisk even gave between $100,000 and $399,999 to the Congressional Black Caucus Foundation.[54]

---

[46] https://adage.com/article/special-report-hottest-brands/ozempic-hottest-brands-most-popular-marketing-2023/2500571?utm_source=exchange&utm_medium=email&utm_campaign=t5687390

[47] https://www.mmm-online.com/home/channel/spending-on-ozempic-wegovy-surges/

[48] https://www.usatoday.com/story/life/health-wellness/2023/03/13/ozempic-sweeping-hollywood-celebrities-weight-loss/11428801002/ (last accessed Sept. 17, 2023).

[49] https://www.youtube.com/watch?v=QD-nCQn1Ads (last visited on Sept. 17, 2023).

[50] *Id*.

[51] https://www.insider.com/ozempic-celebrities-denied-semaglutide-wegovy-weight-loss-drugs-khloe-kardashian-2023-3#chelsea-handler-said-she-was-on-semaglutide-without-realizing-it-7 (last visited on Sept. 18, 2023).

[52] https://www.npr.org/sections/health-shots/2023/08/07/1192279278/ozempic-and-wegovy-maker-courts-prominent-black-leaders-to-get-medicares-favor (last visited Sept. 17, 2023)

[53] https://www.essence.com/health-and-wellness/yvette-nicole-brown-fighting-obesity/ (last visited on Sept. 18, 2023).

[54] https://www.npr.org/sections/health-shots/2023/08/07/1192279278/ozempic-and-wegovy-maker-courts-prominent-black-leaders-to-get-medicares-favor (last visited Sept. 17, 2023)

62. Novo Nordisk and Eli Lilly combined are spending roughly ten million dollars annually on lobbying.[55]

63. A primary focus of that lobbying is the proposed Treat and Reduce Obesity Act, which has been introduced in congressional sessions annually since 2012. The Treat and Reduce Obesity Act would require Medicare to cover, among other treatments, chronic-weight-management drugs.[56]

64. Defendants and their competitors have promoted the message that "obesity is a disease" and largely due to "genetics" and "not a choice," in addition to promoting the message that coverage of pharmaceutical drugs for obesity is a step toward health equity.[57] What is not promoted is that this message directly impacts Defendants' pocketbooks by encouraging insurance to cover their drugs. Defendants' messaging encourages patients and prescribers to forgo lifestyle changes – long the cornerstone of healthy weight loss – in favor of powerful, dangerous, and expensive drugs.

65. Anticipating the passage of this bill within the next few years, Morgan Stanley forecasts that U.S. revenue from such drugs will increase four-hundredfold by the end of the decade. Obesity looks "set to become the next blockbuster pharma category," it declared in a report last year, which also predicted that social media and word of mouth will create an "exponential virtuous cycle" around the new medications: a quarter of people with obesity will seek treatment from physicians, up from the current seven per cent, and more than half of those who do will begin

[55] https://www.npr.org/sections/health-shots/2023/08/07/1192279278/ozempic-and-wegovy-maker-courts-prominent-black-leaders-to-get-medicares-favor (last visited Sept. 17, 2023)
[56] https://www.newyorker.com/magazine/2023/03/27/will-the-ozempic-era-change-how-we-think-about-being-fat-and-being-thin (last visited Sept. 17, 2023); https://www.fiercepharma.com/pharma/novo-nordisk-eli-lilly-and-boehringer-get-behind-lawmakers-bill-enable-obesity-drug-coverage (accessed Sept. 17, 2023)
[57] https://www.statnews.com/2022/01/06/recognizing-obesity-as-a-disease-is-a-step-toward-health-equity/ (last visited on Sept. 18, 2023); https://www.womenshealthmag.com/health/a42679413/causes-of-obesity-genetics-lifestyle/ (last visited on Sept. 18, 2023)

taking medicine.[58]

66. Defendants also own and operate several marketing campaign websites that are created for the purposes of educating on the science of obesity and creating a change in how obesity is understood and treated.

67. This includes the website "The Truth about Weight."[59]

68. This website includes headings such as "my weight, my culture," with these "my weight, my culture" hashtags appearing on Instagram with an apparent focus to target Black, Brown, and Hispanic individuals.[60]

69. Defendants also own and operate the website "It's Bigger Than Me."[61] This advertising campaign website promotes the message that obesity is a chronic health condition that requires pharmaceutical drugs to manage.[62]

70. The hashtag #itsbiggerthan also reveals paid social media influencers promoting "body positivity" and linking back to Novo Nordisk's website (and ultimately to their weight loss drugs).

71. Novo Nordisk's presentation on capital markets day makes it clear that these campaigns are designed to "activate more people to seek treatment for obesity."[63]

72. Defendants have also spent significant resources aligning themselves and infiltrating their influence into physician and advocacy groups.

73. This includes the American Board of Obesity Medicine. The former Director of the

---

[58] https://www.newyorker.com/magazine/2023/03/27/will-the-ozempic-era-change-how-we-think-about-being-fat-and-being-thin (last visited on Sept. 18, 2023).
[59] https://www.truthaboutweight.com/ (last visited on Sept. 18, 2023).
[60] https://www.truthaboutweight.com/understanding-excess-weight/my-weight-my-culture html (last visited on Sept. 18, 2023).
[61] https://www.itsbiggerthan.com (last accessed Sept. 18, 2023).
[62] *Id.*
[63] https://www.novonordisk.com/content/dam/nncorp/global/en/investors/pdfs/capital-markets-day-2022/P5-obesity-care.pdf (last visited on Sept. 18, 2023).

American Board of Obesity Medicine who served from 2017 to November of 2021 received payments from Novo Nordisk during her time as director of the American Board of Obesity Medicine.[64]

74. This former director of the American Board of Obesity Medicine currently promotes their GLP-1 agonists for weight loss as part of their telehealth company and continues to receive payments.[65]

75. At least one member of the American Board of Obesity Medicine who helped write the guidelines for obesity management has received payments directly from Novo Nordisk according to Open Payments Data during the same time he wrote those guidelines.[66]

76. Dr. Jamy Ard of Wake Forest University is the incoming president of The Obesity Society. In that role, he will oversee the group's effort to write new "standards of care," which primary-care doctors often use as a quick-reference guide, with advice on Wegovy and similar therapies.[67] Dr. Ard has accepted more than $200,000 from Novo Nordisk, according to Reuters.[68]

77. Novo Nordisk contributes money directly to education courses used to satisfy continuing education requirements or to prepare for certification in obesity medicine. This includes contributing $10,000 to the popular obesity-treatment education course of Dr. Kaplan – a physician who has received over $1 million from Novo Nordisk over the past decade.[69]

78. Novo Nordisk has also influenced and infiltrated the public health partners of the

[64] https://joinfound.com/pages/medication-biology (last visited on Sept. 18, 2023); https://openpaymentsdata.cms.gov/physician/1294300 (last visited on Sept. 18, 2023); https://www.linkedin.com/in/rekha-kumar-m-d-m-s-70b481237/ (last visited on Sept. 18, 2023).
[65] https://joinfound.com/pages/medication-biology (last visited on Sept. 18, 2023);https://openpaymentsdata.cms.gov/physician/1294300 (last visited on Sept. 18, 2023); https://www.linkedin.com/in/rekha-kumar-m-d-m-s-70b481237/ (last visited on Sept. 18, 2023).
[66] https://openpaymentsdata.cms.gov/physician/1379381 (last visited Sept. 18, 2023); see also https://www.abom.org/karl-nadolsky/.
[67] https://www.reuters.com/investigates/special-report/health-obesity-novonordisk-doctors/
[68] https://www.reuters.com/investigates/special-report/health-obesity-novonordisk-doctors/
[69] https://www.reuters.com/investigates/special-report/health-obesity-novonordisk-doctors/

American Board of Obesity Medicine.

79. The American Board of Obesity Medicine lists public health "partners" on their website.[70]

80. Novo Nordisk serves on the board and/or provides direct financial contributions to many of these public health advocacy groups.

81. This includes Obesity in Action Coalition, to which Novo Nordisk contributes more than $500,000 annually.[71] Novo Nordisk has been a partner since 2013, before any of its drugs were approved for weight loss.

82. Novo Nordisk also serves on the Corporate Council of American Society for Metabolic and Bariatric Surgery, another public health partner of the American Board of Obesity Medicine.[72]

83. Novo Nordisk is also a corporate member and directly financially contributes to Stop Obesity Alliance, yet another public health partner of the American Board of Obesity Medicine.[73]

84. Novo Nordisk is a member of additional advocacy organizations and lobbying groups separate and apart from these public health partners of the American Board of Obesity Medicine.

85. This includes the Obesity Care Advocacy Network, which lobbies for legislation to expand access to Novo Nordisk's drugs.[74]

86. In addition to promoting lobbying groups, Novo Nordisk has "paid more than

[70] https://www.abom.org/ (last visited on Sept. 18, 2023).
[71] https://www.obesityaction.org/corporate-partners/ (last accessed Sept. 18, 2023).
[72] https://asmbs.org/corporate-council (last visited Sept. 18, 2023).
[73] https://stop.publichealth.gwu.edu/membership (last visited on Sept. 18, 2023).
[74] https://assets.obesitycareadvocacynetwork.com/TROA_fact_sheet_11_12_21_48098432e0/TROA_fact_sheet_11_12_21_48098432e0.pdf (last visited on Sept. 18, 2023).

$250,000 in campaign contributions to members of Congress in an effort to pass legislation to make the U.S. government pay for Wegovy, a $1,300-per-month-per-person proposition."[75]

87. Novo Nordisk has also partnered with think tanks to promote their narrative that obesity is a disease for which treatment requires their billion-dollar pharmaceutical drugs.

88. For example, the Milken Institute is a think tank focused on accelerating measurable progress on the path to a meaningful life.[76]

89. As early as 2019, before Ozempic or Wegovy was approved for weight loss, Defendants were publishing articles on the Milken Institute about the "untold story of obesity."[77]

90. Defendants have deceptively promoted their weight loss drugs on television and news segments.

91. For example, Novo Nordisk's drugs were the subject of an investigative report on 60 Minutes that aired New Year's Day of 2023.[78]

92. Complaints have been filed alleging that the "news" piece was in reality "deceptive marketing" in which all physicians interviewed had received payments from Novo Nordisk. [79]

93. The financial relationship between the physicians speaking about Wegovy and Ozempic and Novo Nordisk was not explicitly disclosed.[80] The reporter stated that the physicians had *advised* Novo Nordisk, but failed to state they had been compensated by the company.[81]

94. The nonprofit public health advocacy group the Physicians Committee issued a

---

[75] https://www.fiercepharma.com/marketing/health-group-lambasts-novo-nordisk-60-minutes-paid-news-program-weight-loss-med-wegovy (last visited Sept. 18, 2023).
[76] https://milkeninstitute.org/about (last visited on Sept. 18, 2023).
[77] https://milkeninstitute.org/article/untold-story-obesity-collaborating-across-sectors-make-care-happen (last visited on Sept. 18, 2023).
[78] https://www.cbsnews.com/news/wegozy-ozempic-explainer-60-minutes-2023-01-01/ (last visited Sept. 18, 2023).
[79] https://www.fiercepharma.com/marketing/health-group-lambasts-novo-nordisk-60-minutes-paid-news-program-weight-loss-med-wegovy (last visited Sept. 18, 2023).
[80] https://fair.org/home/60-minutes-weight-loss-tip-dont-bite-the-hand-that-feeds-you/ (last visited on Sept. 18, 2023).
[81] *Id.*

formal complaint that a recent CBS "60 Minutes" segment was a promotion for Novo Nordisk's obesity drug, Wegovy, that was dressed up as a news segment.[82]

95. The Washington, D.C.-based group has filed a complaint with federal bodies alleging that the CBS "60 Minutes" segment that aired on New Year's Day breached the FDA's "fair balance" rules for drug ads.[83]

96. The Physicians Committee said in a release that the feature failed to talk about alternatives to the drug or about other weight-loss methods; that only experts "paid by Novo" were used in the program; and that the piece used overly promotional language.[84]

97. The FDA is currently investigating the marketing practices of Novo Nordisk.[85]

98. Novo Nordisk has spent millions of dollars delivering their message to physicians, healthcare providers, and consumers.

99. For example, Novo Nordisk spent over $33,000,000 in 2022 on traditional physician marketing and detailing according to Open Payments Data. [86]

100. Defendants have directly and indirectly partnered with telehealth providers to promote their weight loss drugs.

101. This includes a 2019 direct partnership between Novo Nordisk and Noom, a leading behavioral weight loss company.[87] After Saxenda was approved for weight loss, Noom joined with Novo Nordisk again to develop custom programs to accompany this weight loss medication.[88]

---

[82] *Id.*
[83] *Id.*
[84] *Id.*
[85] https://www.pcrm.org/news/news-releases/fda-confirms-investigation-novo-nordisk-ad-posited-60-minutes-story-about-weight (last visited Sept. 18, 2023)
[86] https://openpaymentsdata.cms.gov/company/100000000144 (last visited Sept. 18, 2023)
[87] https://www.prnewswire.com/in/news-releases/novo-nordisk-and-noom-to-partner-around-digital-health-solutions-to-help-people-with-obesity-lose-weight-and-keep-it-off-811725389.html (last visited on Sept. 18, 2023).
[88] https://www.noom.com/blog/in-the-news/noom-announces-two-new-studies-on-impact-of-mobile-coaching-on-binge-eating-disorder-and-obesity/ (last visited on Sept. 18, 2023).

102. In 2021, Novo Holdings participated in a $540 million round of financing with Noom.[89] At that time, Novo Holdings tweeted that it "is pleased to note that it has participated in the $540 million Series F round in @noom, a leading digital health platform…".[90]

103. Novo Holdings currently lists on its website that it has "venture investments" in Noom.[91]

104. Noom Med now provides to consumers, using physicians hired by Noom, prescriptions for weight loss directly to patients.[92]

105. Noom Med promotes off label usage of these weight loss drugs on its website.[93]

106. Noom currently has over 45 million users.[94]

107. Other telehealth providers have jumped on board the bandwagon in offering prescriptions directly to consumers for Defendants' weight-loss medications.

108. This includes Weight Watchers, which purchased telehealth startup Sequence for $132,000,000 in order to provide weight loss medications to its subscribers.[95]

109. There are currently over 3.5 million Weight Watchers subscribers.[96]

110. It also includes Calibrate, yet another telehealth provider for weight loss medications, which raised $100 million in capital funding from investors in 2021.

111. Calibrate's clinical advisory board includes Dr. Fatima Cody Stanford. [97]

---

[89] https://www.businesswire.com/news/home/20210525005492/en/Noom-Announces-540-Million-in-Growth-Funding-to-Further-Accelerate-Expansion-of-its-Digital-Health-Platform
[90] https://twitter.com/novoholdings/status/1397170264702599171
[91] https://novoholdings.dk/investments/noom/
[92] https://abcnews.go.com/GMA/Wellness/noom-joins-weight-watchers-offering-medications-wegovy-weight/story?id=99841160 (last visited on Sept. 18, 2023).
[93] https://www.noom.com/med/ (last visited on Sept. 18, 2023).
[94] https://exitsandoutcomes.com/free-excerpt-from-the-noom-report-a-45-million-moat/ (last visited Sept. 18, 2023).
[95] https://www.usatoday.com/story/news/health/2023/03/07/weightwatchers-sequence-wegovy-obesity-weight-loss-drugs/11415201002/ (last visited on Sept. 18, 2023).
[96] https://finance.yahoo.com/news/ww-international-inc-announces-first-200100340.html#:~:text=%E2%80%9CWe%20expect%20to%20end%202023,including%203.5%20million%20WeightWatchers%20subscribers. (last visited on Sept. 18, 2023).
[97] https://www.joincalibrate.com/about-us (last visited on Sept. 18, 2023).

112. Dr. Cody Stanford is an obesity specialist who frequently speaks on behalf of Novo Nordisk, is featured on Novo Nordisk's website, and has received payments directly from Novo Nordisk.[98] Upon information and belief, Dr. Cody Stanford is one of the highest paid key opinion leaders for Novo Nordisk.

113. This financial and professional conflict of interest is not disclosed on Calibrate's website.

114. This same clinical advisory board member, speaker, and promoter of Novo Nordisk is one of the doctors who appeared on the controversial 60 Minutes news segment discussed above.

[99]




News reports have recognized that such marketing, particularly with telehealth providers, is a "gray area."[100]

115. Dr. Fatima Cody Stanford is also included on Novo Nordisk's website, arguing that

---

[98] https://openpaymentsdata.cms.gov/physician/807348 (last visited on Sept. 18, 2023); https://www novonordisk-us.com/about/perspectives/changing-the-mindset-around-obesity.html (last visited on Sept. 18, 2023).
[99] https://mronline.org/2023/02/13/60-minutes-weight-loss-tip/ (last visited on Sept. 18, 2023).
[100]https://www.statnews.com/2023/04/06/weight-loss-drugs-wegovy-ro-telehealth-ozempic/?utm_campaign=morning_rounds&utm_medium=email&_hsmi=253265291&_hsenc=p2ANqtz-_6H01FfkCg2JOnqJnju52tvRlJrTnn-KTwSkzAv1qkbBHi4MR2mN8wdPsbzj6Csbzm5s5M56muD-1rjaA-IF60zzjN1A&utm_content=253265291&utm_source=hs_email (last visited on Sept. 18, 2023).

access to their weight loss drugs is an issue of equity and disparity for communities of color.[101]

116. Their full financial relationship is not disclosed on Defendants' website.

117. Nor has Dr. Stanford disclosed this relationship in other seemingly independent publications arguing that obesity is a chronic disease that necessitates weight loss medications.[102]

118. Collectively, the telehealth providers that Novo Nordisk directly and indirectly partners with and/or promotes account for approximately half of all weight loss prescriptions in 2022.[103]

119. In sum, the Novo Nordisk Defendants promoted the safety, efficacy, and sale of Ozempic and/or Wegovy in the United States on its websites, in press releases, through in-person presentations, through the drug's label, in print materials, on social media, advocacy groups, lobbying groups, celebrity partnerships, telehealth partnerships, key opinion leaders, and through other public outlets.

120. Novo Nordisk's comprehensive, immersive marketing has left no stone unturned in delivering their message that physicians and patients must use their drugs to treat obesity.

**III. The Development and Approval of Mounjaro and Zepbound**

121. Following the success of Novo Nordisk's Ozempic, scientists and other pharmaceutical companies began exploring the possibilities of combining GLP-1s with other compounds.

122. In the early 2010s, a team of scientists at Indiana University created tirzepatide, Mounjaro's active ingredient, by combining GLP-1 and GIP into a single molecule. [104]

---

[101] https://www novonordisk-us.com/about/perspectives/changing-the-mindset-around-obesity html (last visited on Sept. 18, 2023).
[102] https://www.statnews.com/2022/01/06/recognizing-obesity-as-a-disease-is-a-step-toward-health-equity/ (last visited on Sept. 18, 2023).
[103] https://www.statnews.com/2023/08/10/wegovy-ozempic-weight-loss-telehealth-prescriptions/
[104] https://newatlas.com/triple-agonist-peptide-diabetes-obesity/35180/#:~:text=In%202012%2C%20we%20covered%20work%20led%20by,held%20promise%20as%20a

123. GIP stands for glucose-dependent insulinotropic polypeptide. It is a natural hormone that works alongside GLP-1 to help control blood sugar and promote weight loss by signaling the pancreas to release insulin, slow stomach emptying, and increase feelings of fullness.[105]

124. In pre-clinical trials, obese rats given tirzepatide were observed to decrease their food intake, decrease their body weight and improve their glucose tolerance. [106]

125. Rats given tirzepatide were more likely to develop thyroid C-cell tumors. The offspring of pregnant rats given tirzepatide had fetal abnormalities. [107]

126. From 2018 to 2021, Eli Lilly conducted clinical trials collectively known as SURPASS. [108]

127. From 2019 to 2023, Eli Lilly conducted five additional clinical trials collectively known as SURMOUNT to test the effectiveness, safety, and long-term benefits of tirzepatide for chronic weight management in adults with obesity. [109]

128. The SURMOUNT-4 Trial "was a study of tirzepatide with obesity or weight, The main purpose was to learn about how Tirzepatide maintained body weight loss. The study had two phases: a lead-in phase in which all participants took tirzepatide and a treatment phase in which participants either continued tirzepatide or switched to placebo. The study lasted about 2

%20treatment%20for%20obesity (last visited on Dec. 15, 2025).

[105] https://phelpshealth.org/news/featured-stories/understanding-mounjaro-guide-type-2-diabetes-patients#:~:text=A%20delicate%20balance:%20Glucagon%20is,the%20pancreas%20to%20release%20insulin (last visited on Dec. 15, 2025)

[106] https://www.accessdata.fda.gov/drugsatfda_docs/nda/2022/215866Orig1s000PharmR.pdf (last visited on Dec. 15, 2025)

[107] https://www.accessdata.fda.gov/drugsatfda_docs/label/2022/215866s000lbl.pdf (last visited on Dec. 15, 2025)

[108] https://diabetes.org/newsroom/latest-data-from-SURPASS-trials-demonstrate-tirzepatide-provided-blood-sugar-reductions-weight-loss#:~:text=Blood%20Sugar%20Reductions-,Latest%20Data%20From%20SURPASS%20Trials%20Demonstrate%20Tirzepatide%20Provided%20Meaningful%20Blood,with%20a%20test%20called%20A1C (last visited on Dec. 15, 2025)

[109] https://www.lilly.com/en-CA/news/press-releases/2024.12.4-tirzepatide-surmount-5-h2h

years (25 visits)."[110]

129. The final trial, SURMOUNT-5, compared tirzepatide to Wegovy.[111]

130. Eli Lilly was already testing the drug's effectiveness for chronic weight management before it had been approved for Type 2 diabetes. Eli Lilly submitted a new drug application (NDA 215866) for tirzepatide under its brand name Mounjaro on September 15, 2021. [112]

131. The FDA approved Mounjaro on May 13, 2022, for the regulation of type 2 diabetes.[113]

132. Eli Lilly continues to be the holder of the NDA and therefore is required to submit supplements to the NDA, complete post-marketing surveillance, submit adverse event reports, maintain correspondence with the FDA and update the label.

133. The FDA's approval was based on the first nine SURPASS and SURMOUNT trials.[114]

134. In a news release dated May 13th, 2022, Eli Lilly reported that "While not indicated for weight loss, Mounjaro led to significantly greater weight reductions versus comparators in a key secondary endpoint." [115]

135. In a news release dated October 6th, 2022, the president of Lilly Diabetes, Mike Mason, stated "[o]besity is a chronic disease that impacts the health of nearly 100 million Americans and is a significant driver of healthcare costs… we are dedicated to helping people

---

[110] https://clinicaltrials.gov/study/NCT04660643
[111] *Id.*
[112] https://www.govinfo.gov/content/pkg/FR-2024-02-29/html/2024-04157.htm (last visited on Dec. 15, 2025)
[113] https://www fda.gov/drugs/drug-approvals-and-databases/drug-trials-snapshots-mounjaro#:~:text=MOUNJARO%20(tirzepatide),How%20is%20this%20drug%20used (last visited on Dec. 15, 2025)
[114] *Id.*
[115] https://investor.lilly.com/news-releases/news-release-details/fda-approves-lillys-mounjarotm-tirzepatide-injection-first-and (last visited on Dec. 15, 2025)

living with obesity through our research and development of innovative treatments like tirzepatide, which produced significant weight reductions in patients taking tirzepatide for type 2 diabetes in SURPASS." [116]

136. Eli Lilly acknowledges that Mounjaro is not a weight loss medication but simultaneously advertised its weight loss capabilities before the active ingredient, tirzepatide, was approved for chronic weight management by the FDA. [117]

137. On October 6th, 2022, the FDA granted Fast Track designation for the investigation of tirzepatide for the treatment of obese adults or overweight adults with weight-related comorbidities. [118]

138. On November 17th, 2022, Eli Lilly and Co. initiated a rolling submission for their Zepbound NDA (NDA 217806). [119]

139. The FDA dated and received the NDA on May 8th, 2023. [120]

140. The FDA approved tirzepatide under Eli Lilly's brand name Zepbound on November 8th, 2023, for chronic weight management in adults with obesity or adults who are overweight with at least one weight-related condition. [121]

141. According to a November 19th, 2025 summary of risk management plan released by Eli Lilly, patients with a history of proliferative diabetic retinopathy, nonproliferative diabetic retinopathy, and diabetic maculopathy were excluded from the tirzepatide clinical trial

[116] https://investor.lilly.com/news-releases/news-release-details/lilly-receives-us-fda-fast-track-designation-tirzepatide (last visited on Dec. 15, 2025)
[117] https://investor.lilly.com/news-releases/news-release-details/fda-approves-lillys-mounjarotm-tirzepatide-injection-first-and (last visited on Dec. 15, 2025)
[118] https://investor.lilly.com/news-releases/news-release-details/lilly-receives-us-fda-fast-track-designation-tirzepatide (last visited on Dec. 15, 2025)
[119] *Id.*
[120] https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2023/217806Orig1s000ltr.pdf (last visited on Dec. 15, 2025)
[121] FDA Approves New Medication for Chronic Weight Management | FDA (last visited on Dec. 15, 2025)

development program. [122]

142. On their website, Defendant Eli Lilly does disclose important safety information and provides a link to their medication guide and prescribing information. However, Defendant Eli Lilly does not specify NAION or permanent vision loss as a risk when taking tirzepatide for either diabetes management or weight management. [123]

## IV. Eli Lilly Aggressively Marketed and Promoted Mounjaro and Zepbound

143. Eli Lilly launched a digital campaign for Mounjaro in January of 2023. [124]

144. On February 12, 2023, the same day as the Super Bowl LVII, Defendant Eli Lilly aired a 75-second advertisement for Mounjaro on FOX titled "What If?". [125]

145. This advertisement kicked off a commercial campaign that included at least seven other commercials, two of which featured Olympic athlete Simone Biles. [126] [127]

146. In March of 2023, Eli Lilly spent $21.4 million on Mounjaro TV advertisements, placing it in the top five pharmaceutical companies that spent the most on TV advertisements for that month. [128]

147. An advertisement that aired as part of the "What If" series indicated that "Mounjaro

---

[122] file:///C:/Users/avillarreal/Downloads/tirzepatide_MounjaroRMPsummary_v1point0%20(1).pdf (last visited on Dec. 15, 2025)

[123] https://mounjaro.lilly.com/how-to-use-mounjaro?gclsrc=aw.ds&gad_source=1&gad_campaignid=23012920200&gbraid=0AAAAAoh_8M_T4v4msb1HY-OSnC7n5uqu4&gclid=EAIaIQobChMIvby4gdq4kQMVT0tHAR0fTAUgEAAYASAAEgLp4_D_BwE (last visited on Dec. 15, 2025)

[124] https://xtalks.com/eli-lilly-spends-big-on-first-mounjaro-tv-commercial-for-diabetes-3424/#:~:text=Mounjaro%20received%20US%20Food%20and,FDA's%20fast%20track%20approval%20pathway (last visited on Dec. 15, 2025)

[125] https://www.ispot.tv/ad/1VpJ/mounjaro-what-if#:~:text=More%20Mounjaro%20Commercials-,Mounjaro%20TV%20Spot%2C%20'I%20See%20You'%20Featuring%20Simone%20Biles,Mounjaro%20TV%20Spot%2C%20'Bridge (last visited on Dec. 15, 2025)

[126] https://www.ispot.tv/ad/BkSt/mounjaro-i-see-you-featuring-simone-biles (last visited on Dec. 15, 2025)

[127] https://www.ispot.tv/ad/6mcG/mounjaro-olympics-working-hard-featuring-simone-biles (last visited on Dec. 15, 2025)

[128] https://www fiercepharma.com/marketing/eli-lillys-new-tv-spot-diabetes-med-mounjaro-leaps-top-dtc-ad-spenders-list (last visited on Dec. 15, 2025)

is not a weight loss drug" in small font at the bottom of the screen, but also clearly indicated that Mounjaro can help decrease how much food you eat. [129]

148. In May of 2025, Eli Lilly launched a marketing campaign titled "Duets for Type 2 Diabetes" featuring *Modern Family* actor Eric Stonestreet. [130]

149. As part of their paid partnership, a promotional video was released on May 2nd, 2025, featuring the actor and his mother, who both have Type 2 diabetes and take Mounjaro. [131]

150. In this video, Eric Stonestreet referred to Mounjaro as a "teammate" that helped him manage his type 2 diabetes and related symptoms. [132]

151. Stonestreet also stated that they participated in the paid partnership because they wanted to inspire others to talk to their doctors about Mounjaro. [133]

152. On April 11, 2023, the New York Times reported that some research has found that "Mounjaro may be even more powerful than either Ozempic or Wegovy." It also reported that "many people [are] using it off-label to lose weight." [134]

153. Although a representative from Eli Lilly denied promoting or encouraging "the off-label use of any of [their] medicines," Eli Lilly was clearly interested in using tirzepatide for chronic weight management. [135]

154. On March 18th, 2024, Oprah Winfrey hosted a television special titled "An Oprah Special: Shame, Blame, and the Weight Loss Revolution" where she was joined by representatives from Eli Lilly and Novo Nordisk who discussed their respective weight loss medications. [136]

---

[129] https://www.ispot.tv/ad/fWgz/mounjaro-what-if (last visited on Dec. 15, 2025)
[130] https://mounjaro.lilly.com/duets (last visited on Dec. 15, 2025)
[131] *Id.*
[132] *Id.*
[133] *Id.*
[134] https://www nytimes.com/2023/04/11/well/live/ozempic-mounjaro-weight-loss-diabetes html (last visited on Dec. 15, 2025)
[135] *Id.*
[136] https://www fiercepharma.com/marketing/oprah-shines-her-star-power-glp-1s-new-weight-loss-drugs-tv-

155. This special featured Dr. W. Scott Butsch and Dr. Amanda Velazquez who are both paid consultants and have received research funding from Eli Lilly. The video also features Rhonda Pacheco, Group Vice President of Diabetes and Obesity for Eli Lilly. [137]

156. Subsequently, the FDA issued a warning letter to both Defendants for their misleading drug advertisements determining that the media was false or misleading. [138]

157. In the letter, the FDA claimed that both Defendants discussed the benefits of their medications while omitting or understating the risks associated with these medications and the warnings associated with each drug. [139]

158. In early 2024, Eli Lilly launched a campaign titled "Get Better" with a new focus on obesity. [140]

159. They aired two films showcasing their "point of view around obesity—emphasizing [their] commitment to patients by highlighting the seriousness of this disease and the appropriate use of anti-obesity medicines." [141]

160. The second film, titled "Big Night," was released in March of 2024 during the Oscars. [142]

161. They have also invested in a branding campaign titled "A Medicine Company" intended to strengthen Eli Lilly's brand as a company that values "health above all" and as a

special#:~:text=When%20Winfrey%20asked%20why%20coverage,ABC%20to%20support%20the%20broadcast (last visited on Dec. 15, 2025)

[137] https://www fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/eli-lilly-and-company-716485-09092025 (last visited on Dec. 15, 2025)

[138] *Id.*

[139] https://www.pharmexec.com/view/fda-warning-letters-novo-nordisk-eli-lilly-hims-regarding-misleading-advertising (last visited on Dec. 15, 2025)

[140] https://investor.lilly.com/news-releases/news-release-details/lillys-newest-phase-get-better-campaign-challenges (last visited on Dec. 15, 2025)

[141] *Id.*

[142] https://www.youtube.com/watch?v=lZ3Dt74R4ak, https://www.youtube.com/watch?v=zQWk-Q3tmkE (last visited on Dec. 15, 2025)

pharmaceutical company that can be trusted. [143]

162. Lina Polimeni, chief corporate brand officer at Eli Lilly stated "[p]eople understand Lilly as a manufacturer of medicine, but don't always understand Lilly as a company or as a brand." Also, "[t]here's a big effort happening right now in building a brand that people love and trust — one that explains why we make medicine for people and tackle diseases that are so hard to treat."[144]

163. According to open payments data, Eli Lilly spent $7,745,971.25 on marketing/consulting/travel/food and beverage/etc. to physicians or medical institutions in 2024 alone. [145]

164. In 2023, they spent $6,136,076.18 on the same. [146]

165. Eli Lilly has spent money on grants to various hospitals like the Tufts Medical Center to whom they gave $250 million. [147]

166. By the end of 2022, Mounjaro had sales of $482.5 million. In 2023, its first full year on the market, Mounjaro brought in nearly $5.2 billion. [148]

167. On December 18th, 2023, GlobalData reported that, based on clinical data, sales for Mounjaro are forecasted at $27 billion by 2029. [149]

168. In 2024, Mounjaro was ranked the ninth best-selling drug, generating $11,540,100,000 in sales. [150]

---

[143] https://www.adweek.com/brand-marketing/eli-lillys-big-task-become-a-loved-and-trusted-pharma-brand/ (last visited on Dec. 15, 2025)
[144] https://www.campaignlive.com/article/lilly-building-brand-people-trust/1893652 (last visited on Dec. 15, 2025)
[145] https://openpaymentsdata.cms.gov/company/100000000088 (last visited on Dec. 15, 2025)
[146] *Id.*
[147] *Id.*
[148] https://www.pewresearch.org/short-reads/2024/03/21/as-obesity-rates-rise-in-the-us-and-worldwide-new-weight-loss-drugs-surge-in-popularity/ (last visited on Dec. 15, 2025)
[149] https://www.globaldata.com/media/pharma/obesity-drug-mounjaro-to-surpass-ozempic-with-27-billion-sales-in-2029-forecasts-globaldata/ (last visited on Dec. 15, 2025)
[150] https://www.drugdiscoverytrends.com/2024s-blockbusters-top-50-pharmaceuticals-by-sales/ (last visited on Dec.

169. Eli Lilly spent approximately $8,593,800,000 on marketing, selling, and administrative expenses in 2024. [151]

170. They spent $7,403,100,000 on the same in 2023. [152]

171. By the second quarter of 2025, Mounjaro had surpassed Ozempic in sales at over $5 billion. [153]

172. Mounjaro has experienced the highest monthly gross sales post-launch compared to some other GLP-1 RAs including Ozempic. As of September 13th, 2025, Mounjaro was producing around $3 billion a month for Eli Lilly. [154]

173. A November 6, 2025 article published in the scientific journal *Nature* stated that tirzepatide was on track to be the top selling drug in the world in 2025. [155] [156]

174. Eli Lilly serves on the board and/or provides direct financial contributions to many public health advocacy groups, including the Obesity Action Coalition. [157]

175. Eli Lilly and Novo Nordisk are members of the Obesity Medicine Association's Corporate Council. [158]

176. They are platinum members of this council, meaning they contribute more than $100,000 annually to the coalition's general operating efforts. [159]

177. Eli Lilly has been a contributing supporter to the coalition since 2020, before any

---

15, 2025)

[151] https://www.statista.com/statistics/517713/eli-lilly-marketing-expenses/?srsltid=AfmBOooh4INZhImNQmWYuAN77jRyz_imlJeTdp6nMNFxZxJlCzXDDPgH (last visited on Dec. 15, 2025)

[152] Id.

[153] https://www.drugdiscoverytrends.com/top-25-drugs-by-sales-2025-h1/ (last visited on Dec. 15, 2025)

[154] https://www.iqvia.com/locations/united-states/blogs/2025/09/obesity-deep-dive-the-unparalleled-launch-success-of-mounjaro-and-zepbound (last visited on Dec. 15, 2025)

[155] https://www nytimes.com/2025/11/21/health/eli-lilly-one-trillion-value-pharmaceuticals.html (last visited on Dec. 15, 2025)

[156] https://www nature.com/articles/d41573-025-00183-y (last visited on Dec. 15, 2025)

[157] https://www.obesityaction.org/corporate-partners/ (last visited on Dec. 15, 2025)

[158] https://obesitymedicine.org/resources/vendor-directory/ (last visited on Dec. 15, 2025)

[159] https://www.obesityaction.org/corporate-partners/ (last visited on Dec. 15, 2025)

of its drugs were approved for weight loss. [160]

178. In sum, Defendant Eli Lilly promoted the safety, efficacy, and sale of Mounjaro in the United States on its websites, in press releases, through in-person presentations, through the drug's label, in print materials, on social media, advocacy groups, lobbying groups, celebrity partnerships, telehealth partnerships, key opinion leaders, and through other public outlets and has never disclosed NAION resulting in permanent vision loss as a risk of the medication.

179. On May 24th, 2024, the Wall Street Journal reported that Eli Lilly spent $5.3 billion to boost manufacturing capacity for Zepbound and Mounjaro to ease shortages of the drugs. They referred to this investment as the "largest manufacturing investment in company history." [161]

180. Eli Lilly has integrated with numerous other telehealth companies like Noom to provide their weight loss medications to consumers. [162]

**V. Marketing Works: Eli Lilly's Rampant Promotion Resulted in Thousands of Prescriptions and Billions in Sales.**

181. As a result of Defendant Eli Lilly's all-encompassing advertising and promotion efforts, Mounjaro and Zepbound are widely prescribed throughout the United States.

182. Millions of Americans have been prescribed Mounjaro since its 2022 FDA approval, though exact prescription rates or current user numbers are unavailable due to discontinuations and access barriers. [163]

---

[160] *Id.*
[161] https://www.wsj.com/health/pharma/eli-lilly-boost-supply-mounjaro-zepbound-weight-loss-drugs-d7060ef2?gaa_at=eafs&gaa_n=AWEtsqdNL_RPuCMGNGxal7XO8X0aJVT9G4xcB5jz9Yr3L1CJIzAf7D_JXWXO&gaa_ts=693c66db&gaa_sig=dx015W7HoeMCEOSZjtohKvIc-GkaYbXZO4wA9R9OtaeXQvezsUnWJOM5LQeLSitjn0A6BiJOYhYPR61lLGJevQ%3D%3D (last visited on Dec. 15, 2025)
[162] https://www noom.com/in-the-news/noom-to-streamline-access-to-zepbound-vials-with-noom-glp-1-companion-through-integration-with-lillydirect-pharmacy-provider/?srsltid=AfmBOopZtRpDqDtHAkAvdIhz2i5v-GhSGkaLJWMWQuDZCDL-Jy-VNnNh (last visited on Dec. 15, 2025)
[163] https://www fellahealth.com/guide/how-many-people-are-on-tirzepatide#:~:text=11,to%20discontinuations%20and%20access%20barriers (last visited on Dec. 15, 2025)

183. By 2023, the rate of Mounjaro prescribing had increased by 0.4% from the previous year and by 2024 it increased by 0.8%. [164]

184. By 2023, semaglutide and Mounjaro made up 70% of all spending done by Americans on GLP-1 RAs. [165]

185. Following the approval of Zepbound, tirzepatide prescriptions increased from 1.1 million to 1.4 million monthly prescriptions by February 2024. [166]

186. During December 2024, overall prescribing rates of anti-obesity medication were highest for tirzepatide. [167]

187. A 2024 study estimated that Mounjaro's use grew by more than 250% each month in its first year of release, despite only being available for seven out of 12 months that year. [168]

188. Just three years post-launch, Mounjaro reached an average of 9 patients per provider.[169]

189. Since 2022, the number of providers prescribing Mounjaro and the ratio of prescribed patients to prescribers has been increasing steadily. [170]

**VI. Use of Mounjaro and Zepbound has been linked to the development of NAION**

190. Defendant Eli Lilly knew or should have known of the risk of NAION with use of Mounjaro and/or Zepbound.

191. Defendant conducted clinical trials and has access to case reports and medical

---

[164] https://www.truveta.com/blog/research/glp1-prescription-trends-december-2024#:~:text=%2C%20or%20unknown).-,Overall%20prescribing%20trends,semaglutide%20(sold%20as%20Wegovy) (last visited on Dec. 15, 2025)
[165] https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2832114 (last visited on Dec. 15, 2025)
[166] https://pmc ncbi.nlm nih.gov/articles/PMC11780480/ (last visited on Dec. 15, 2025)
[167] https://www medrxiv.org/content/10.1101/2025.03.06.25323524v1 (last visited on Dec. 15, 2025)
[168] https://www.singlecare.com/blog/news/mounjaro-statistics-2025/ (last visited on Dec. 15, 2025)
[169] https://www.iqvia.com/locations/united-states/blogs/2025/09/obesity-deep-dive-the-unparalleled-launch-success-of-mounjaro-and-zepbound (last visited on Dec. 15, 2025)
[170] *Id.*

literature that provide them with superior knowledge compared to the general public as to the potential risks of their medications.

192. Non-arteritic anterior ischemic optic neuropathy (NAION) is a medical condition involving damage to the optic nerve resulting in the loss of vision.

193. It falls within the category of an eye stroke.

194. While the precise cause of NAION is unknown, the general belief amongst the medical community is that the condition is caused by insufficient blood supply or ischemia to the optic nerve.

195. "[T]ransient hypoperfusion of the short posterior ciliary arteries causes acute ischemia to the optic nerve head (ONH), resulting in axonal swelling. This swelling compromises the axoplasmic flow, which subsequently increases the axonal swelling, contributing to the compression of ONH microcirculation, exacerbating the ischemia."[171]

196. Anterior ischemic optic neuropathy (AION) involves the 1mm segment of the optic nerve head, also known as the optic disc, and results in visible disc swelling.[172]

197. Typically, NAION patients present with acute, painless vision loss in one eye that is often described as blurry or cloudy while 8-12% of patients may have accompanying pain such as a headache or periocular pain.[173]

198. The vision loss may occur over hours to days, but generally NAION patients notice vision loss or even total blindness upon waking in the morning.[174]

199. Unfortunately, there is no effective treatment for NAION. Vision may worsen in

[171]Wu, Kevin Yang and Evoy, François NAION: Diagnosis and Management. American Academy of Ophthalmology. August 1, 2022. Accessed February 18, 2025. https://www.aao.org/eyenet/article/naion-diagnosis-and-management
[172] Non-Arteritic Anterior Ischemic Optic Neuropathy (NAION). American Academy of Ophthalmology, EyeWiki. https://eyewiki.org/Non-Arteritic_Anterior_Ischemic_Optic_Neuropathy_(NAION). Accessed February 18, 2025.
[173] *Id.*
[174] *Id.*

the four weeks following the event. Some patients may see modest improvement in their vision, but complete recovery of vision is unusual.[175]

200. Some NAION patients lose complete vision with no recovery in affected eye(s).

201. Reduced or loss of vision has a detrimental impact on a person's day-to-day life. Many NAION patients cannot drive or have driving restrictions, cannot read or have trouble reading, and may be unable to continue in their line of employment. Being blinded in one eye and certainly both eyes results in bumps and falls and injuries related to the unseen impacts and accidents.

202. GLP-1 receptors have been detected in neuronal cells in the human eye.[176]

203. For example, clinical observations by astute neuro-ophthalmologists at the Harvard-affiliated Massachusetts Eye and Ear ("Mass Eye and Ear") who noted a surge of NAION cases amongst patients on a different GLP-1 drug, Ozempic, led them to conduct a retrospective, matched cohort study of neuro-ophthalmic patients at Mass Eye and Ear, Boston.

204. The study "Risk of Nonarteritic Anterior Ischemic Optic Neuropathy in Patients Prescribed Semaglutide" authored by Hathaway *et al.* involved patients examined in the neuro-ophthalmology clinic between December 1, 2017 and November 30, 2023 and consisted of 17,298 patients including 16,827 patients over the age of 12, of whom 710 had type 2 diabetes (T2D) and 979 were overweight or obese.[177]

205. Of the 710 T2D patients, 194 patients were prescribed semaglutide and 516 were

---

[175] Wu, Kevin Yang and Evoy, François NAION: Diagnosis and Management. American Academy of Ophthalmology. August 1, 2022. Accessed February 18, 2025. https://www.aao.org/eyenet/article/naion-diagnosis-and-management

[176] Hebsgaard JB, Pyke C, Yildirim E, Knudsen LB, Heegaard S, Kvist PH. Glucagon-like peptide-1 receptor expression in the human eye. *Diabetes Obes Metab*. 2018; **20**(9): 2304-2308. doi:10.1111/dom.13339

[177] Hathaway JT, Shah MP, Hathaway DB, et al. Risk of Nonarteritic Anterior Ischemic Optic Neuropathy in Patients Prescribed Semaglutide. JAMA Ophthalmol. 2024;142(8):732–739. doi:10.1001/jamaophthalmol.2024.2296

prescribed other non-GLP-1 RA antidiabetic medications.[178]

206. Of the 979 overweight/obese patients, 361 were prescribed semaglutide and 618 were prescribed other non-GLP-1 RA anti-obesity medications.[179]

207. Within the T2D study population, NAION occurred in 17 patients in the semaglutide cohort vs. 6 in the non-GLP-1 RA cohort. The Kaplan-Meier survival analysis at 36 months showed a cumulative incidence of NAION of 8.9% (95% CI, 4.5%-13.1%) for the semaglutide cohort vs 1.8% (95% CI, 0%-3.5%) for the nonsemaglutide cohort and the Cox proportional hazards regression model showed a higher NAION risk in the semaglutide cohort vs the nonsemaglutide cohort (HR, 4.28; 95% CI, 1.62-11.29; *P* < .001; concordance coefficient = 0.84).[180]

208. Within the overweight/obese cohort, NAION occurred in 20 patients in the semaglutide cohort vs. 3 in the non-GLP-1 RA cohort. The Kaplan-Meier survival analysis at 36 months showed a cumulative incidence of NAION of 6.7% (95% CI, 3.6%-9.7%) for the semaglutide cohort vs 0.8% (95% CI, 0%-1.8%) for the nonsemaglutide cohort and the Cox proportional hazards regression model showed a higher NAION risk in the semaglutide cohort vs the nonsemaglutide cohort (HR, 7.64; 95% CI, 2.21-26.36; P < .001; concordance correlation coefficient = 0.86).[181]

209. The primary outcome of the Hathaway *et al.* study is that use of Ozempic is associated with an increased risk of NAION. "The relatively high HRs (4.28 and 7.64 for our T2D and overweight or obese cohorts, respectively) identified by our Cox regression analyses reveal a substantially increased risk of NAION among individuals prescribed semaglutide relative to those

---

[178] *Id.*
[179] *Id.*
[180] *Id.*
[181] *Id.*

prescribed other medications to treat T2D and obesity or overweight."[182]

210. Acknowledging the pathogenesis or cause of NAION remains unknown, the authors did not determine the mechanism by which semaglutide causes NAION; however, it was hypothesized that expression of the GLP-1 receptor in the optic nerve and GLP-1 RA–induced enhanced sympathetic nervous system activity might influence optic nerve head perfusion and potentially increase the risk of NAION.[183]

211. A meta-analysis of all clinical trials of GLP-1 receptor drugs found a non-statistically significant increased risk of optic ischemic neuropathy.[184] Because optic ischemic neuropathy is rare, the authors note there may have been underreporting in the clinical trials, leading to a lower estimated risk.[185] However, the study concluded the overall rate of optic ischemic neuropathy was higher in the GLP1-RA group compared to the placebo group: 5.6 and 3.0 cases per 100,000 patient-years, respectively, which is nearly a doubling of the risk.[186]

212. A recent case series published by Katz *et al.*, "Ophthalmic Complications Associated With the Antidiabetic Drugs Semaglutide and Tirzepatide," also examined nine patients taking GLP1-RA medications who had experienced ophthalmologic complications. Of the nine patients, seven developed NAION.[187]

213. The Katz article included a report of a woman with type 2 diabetes taking insulin and semaglutide and evidence of positive challenge and rechallenge with semaglutide.[188]

---

[182] *Id.*
[183] *Id.*
[184] Silverii GA, Pala L, Cresci B, Mannucci E. Glucagon-like peptide 1 (GLP1) receptor agonists and risk for ischemic optic neuropathy: A meta-analysis of randomised controlled trials. *Diabetes Obes Metab*. 2025; 27(2): 1005-1009. doi:10.1111/dom.16076
[185] *Id.*
[186] *Id.*
[187] Katz BJ, Lee MS, Lincoff NS, et al. Ophthalmic Complications Associated With the Antidiabetic Drugs Semaglutide and Tirzepatide. *JAMA Ophthalmol*. Published online January 30, 2025. doi:10.1001/jamaophthalmol.2024.6058
[188] *Id.*

214. The morning after the patient's first injection of semaglutide, she experienced painful vision loss in her left eye and was diagnosed with bilateral optic nerve swelling, and the initial impression was optic neuritis with poor recovery. She discontinued the medication only to start it again approximately two months later after which she then experienced painful vision loss in her right eye. Imaging performed on the right eye was consistent with NAION.

215. The same article includes reports of three patients who developed NAION following tirzepatide use.[189]

216. The first case involved a man in his sixties reporting a painless shade in the superior field of his left eye after using tirzepatide injections for a year. He was diagnosed with NAION after thorough testing to rule out other conditions. [190]

217. The second case involved a man in his sixties who experienced painless vision loss in his left eye upon awakening. He had been taking tirzepatide for a year when his dose was increased to 10 mg of tirzepatide weekly. His vision loss occurred 4 months after this dosage increase and he was diagnosed with NAION. [191]

218. The third case involved a woman in her fifties who experienced painless vision loss in her left eye upon awakening 5 months after she started tirzepatide. She was diagnosed with NAION.[192]

219. On August 11th, 2025, a cohort study was conducted and published in *JAMA*. This study aimed to determine if using semaglutide or tirzepatide was associated with an increased risk of NAION and other optic nerve or visual pathway disorders. [193]

---

[189] *Id.*
[190] *Id.*
[191] *Id.*
[192] *Id.*
[193] Wang, Lindsey, Volkow, MD, Nora D., Kaelber David C., MD, PhD, MPH, Xu, Rong PhD. Semaglutide or Tirzepatide and Optic Nerve and Visual Pathway Disorders in Type 2 Diabetes. *JAMA Ophthalmol*. Published online August 11, 2025. doi:10.1001/jamanetworkopen.2025.26327.

220. The study was conducted with a population of 159,398 patients with Type 2 diabetes, including 79,699 patients taking semaglutide or tirzepatide and a comparison group containing the same number of patients taking other antidiabetic medications. [194]

221. When researchers followed up with patients at two years, 35 patients (0.04%) who were taking semaglutide or tirzepatide developed NAION compared to 19 patients (0.02%) who developed NAION in the comparison group. The study found that treatment with semaglutide or tirzepatide was associated with an increased risk of optic nerve disorders, including NAION. [195]

222. The medical community is continuing to study whether use of GLP-1 RA medications carries a heightened risk of NAION. As stated by the FDA, "[g]iven the severe and irreversible nature of NAION and the growing popularity of GLP-1 RA, we aim to evaluate the previously observed safety signal with respect to NAION using a principled approach to study design and analysis." To that end, the agency has commissioned a non-randomized cohort study analyzing insurance claims data from the FDA Sentinel System's Real-World Evidence Data Enterprise (RWE-DE) Commercial Network (HealthVerity).[196]

223. The study is ongoing and includes patients exposed to GLP-1RA medications indicated for treatment of Type 2 Diabetes, including Mounjaro.[197]

**VII. Defendant Continues to Fail to Disclose the Risk of NAION**

224. According to the Drugs@FDA website, the label for Mounjaro has been updated on at least twelve (12) different occasions since 2022, with the most recent update on September 25, 2025. Despite this fact, Eli Lilly's labels have not contained any warning or any information

---

[194] *Id.*
[195] *Id.*
[196] https://www.sentinelinitiative.org/sites/default/files/documents/Risk-of-NAION-Following-GLP-1-Receptor-Agonist-Use-in-Patients-with-Type-2-Diabetes-Mellitus_v3.0_vF.pdf (last visited on Dec. 15, 2025)
[197] *Id.*

whatsoever on the increased propensity of Mounjaro to cause NAION and permanent vision loss as suffered by Plaintiff. [198]

225. According to the Drugs@FDA website, the label for Zepbound has been updated on at least twenty-one (21) different occasions since 2023, with the most recent update on February 25, 2026. Despite this fact, Eli Lilly's labels have not contained any warning or any information whatsoever on the increased propensity of Zepbound to cause NAION and permanent vision loss as suffered by Plaintiff. [199]

226. To date, the label is still devoid of any mention of NAION.

227. Furthermore, Defendant has failed to take any steps to otherwise warn the medical community, particularly physicians within the ophthalmologic community, to encourage a baseline eye exam prior to starting Mounjaro, monitoring of patients while on the medication, and advising patients to cease use of the medication if they develop symptoms consistent with NAION or after the fact so as not to risk the potential for injury in the other eye.

228. Nothing was or is stopping Defendant from adding a warning regarding the risk of NAION. Defendant could have at any time made "moderate changes" to the label.

229. Specifically, Defendant could have filed a "Changes Being Effected" ("CBE") supplement under Section 314.70(c) of the FDCA to make "moderate changes" to Mounjaro's label without any prior FDA approval.

230. Examples of moderate label changes that can be made via a CBE supplement explicitly include changes "to reflect newly acquired information" in order to "add or strengthen a contraindication, warning, precaution, or adverse reaction." By definition and by regulation such

[198] https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=215866 (last visited on Dec. 15, 2025)
[199] https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=217806 (last visited on Jun. 29, 2026).

changes to add a warning based on newly acquired information—such as that imparted by newly emerging literature like the litany of studies cited above—are considered a "moderate change." 21 C.F.R. § 314.70(c)(6)(iii).

231. Recently, the Third Circuit reaffirmed the plain-text interpretation of the CBE supplement process in a precedential decision holding that the defendant in that case, Merck, could not rely on a preemption defense based on an allegedly irreconcilable conflict between federal (FDCA) and state (civil tort) law so long as the warning could have been effected via a CBE change. *See generally In re Fosamax (Alendronate Sodium) Prods. Liab. Litig.*, Case No. 22-3412, D.I. 82 at 73 on the docket (J. Jordan) (3d Cir. Sept. 20, 2024) (noting "the availability of a label change via a CBE supplement is problematic for Merck, as will very often be the case for pharmaceutical companies raising an impossibility defense").

232. The FDA's Adverse Events Reporting System (FAERS) shows multiple reports of "Optic Ischaemic Neuropathy" reported in connection with use of GLP-1RAs. The earliest reported Optic Ischaemic Neuropathy event associated with any GLP-1RA occurred in 2012, and the earliest associated with semaglutide specifically was in 2019.[200]

**PARTY PLAINTIFF**

233. Plaintiff WILLIAM ANDREW COVINGTON is a resident of the state of Georgia and is currently 49 years old.

234. On or around September 14, 2023, he consulted with Dr. Asma Khan to discuss options for weight loss. As a result of this consultation, Dr. Khan prescribed Wegovy to MR. COVINGTON.

---

[200] The FAERS database is accessible online at https://www.fda.gov/drugs/questions-and-answers-fdas-adverse-event-reporting-system-faers/fda-adverse-event-reporting-system-faers-public-dashboard.

235. Plaintiff was prescribed Wegovy on September 14, 2023.

236. On or around November 11, 2024, Plaintiff was prescribed Zepbound by Dr. Khan.

237. On or around August 12, 2026, Plaintiff was diagnosed with NAION in his left eye by Dr. Nancy Newman, the Director of Neuro-Ophthalmology at Emory University School of Medicine.

238. MR. COVINGTON suffered a significant loss of visual acuity in his left eye.

239. His eyesight loss is permanent.

240. At all times material to the above, the Wegovy label and the Zepbound label failed to adequately warn MR. COVINGTON and his medical providers of the true risks of taking Wegovy and Zepbound.

241. At all times material to the above, the marketing and advertising failed to adequately warn MR. COVINGTON and his medical providers of the true risks of taking Wegovy and Zepbound.

242. His life is forever changed because of his usage of Wegovy and Zepbound.

243. MR. COVINGTON will never see clearly again as a result of his usage of Wegovy and Zepbound.

244. Defendants knew or should have known that use of semaglutide and/or tirzepatide could lead to severe and debilitating injuries suffered by Plaintiff and numerous other patients.

245. Defendants continue to downplay the risk of NAION and have not changed or provided any warnings to the public and medical community.

246. Defendants' Wegovy and Zepbound were at all times utilized and prescribed in a manner foreseeable to Defendants.

247. Plaintiff used Wegovy and Zepbound, and did not misuse or alter Wegovy and/or

Zepbound in an unforeseeable manner.

248. Through their affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiff and his physicians the true and significant risks associated with these medications.

249. As a result of Defendants' actions, Plaintiff and his physicians were unaware, and could not have reasonably known or learned through reasonable diligence, that Plaintiff would be exposed to the risks identified in this Complaint and that those risks were the direct and proximate result of Defendants' conduct.

250. As a direct result of being prescribed and using Wegovy and Zepbound, Plaintiff has been permanently and severely injured, having suffered serious consequences.

251. As a direct and proximate result of his Wegovy use and Zepbound use, Plaintiff suffered severe mental and physical pain and suffering and has sustained permanent injuries and emotional distress, loss of earnings, loss of ability to earn money and other economic losses including past and future medical expenses.

252. Plaintiff diligently investigated the potential cause of these injuries, but their relationship to Wegovy and/or Zepbound was not discovered, and through reasonable care and diligence could not have been discovered, until a date within the applicable statute of limitations for filing Plaintiff's claims.

253. Had Plaintiff and/or Plaintiff's physicians known of the true risks of NAION associated with the use of Wegovy and/or Zepbound, Plaintiff and/or Plaintiff's physicians would not have used the medication and would have chosen a different option for the treatment for his weight loss.

254. Plaintiff's life is forever changed as a result of Defendants' actions and inactions.

**COUNT I**
**STRICT LIABILITY – FAILURE TO WARN**
**(Pursuant to Applicable Product Liability Law)**

255. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

256. Wegovy and/or Zepbound are products within the meaning of Georgia products liability law.

257. At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Wegovy and/or Zepbound and placed these drugs into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

258. Defendants, as the holders of the NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting adverse events, label changes, post-market surveillance and pharmacovigilance.

259. Defendants, as manufacturers, distributors, and marketers of pharmaceutical drugs, are held to the level of knowledge of an expert in the field, and further, Defendants knew or should have known that warnings and other clinically relevant information and data which they distributed regarding the risks associated with the use of Wegovy and/or Zepbound were inadequate.

260. Plaintiff did not have the same knowledge as Defendants and no adequate warning, other clinically relevant information, or data was communicated to Plaintiff or to Plaintiff's prescribing and treating physicians.

261. Defendants had a duty to provide adequate warnings and instructions for Wegovy and/or Zepbound, to use reasonable care to design a product that is not unreasonably dangerous to users, and to adequately understand, test, and monitor their products.

262. Defendants had a continuing duty to provide consumers, including Plaintiff and Plaintiff's physicians, with warnings and other clinically relevant information and data regarding the risks and dangers associated with Wegovy and/or Zepbound, as it became or could have become available to Defendants.

263. Defendants marketed, promoted, distributed and sold unreasonably dangerous and defective prescription drugs, Wegovy and/or Zepbound, to health care providers empowered to prescribe and dispense Wegovy and/or Zepbound to consumers, including Plaintiff, without adequate warnings and other clinically relevant information and data. Through both omission and affirmative misstatements, Defendants misled and continue to mislead the medical community about the risk and benefit balance of Wegovy and/or Zepbound, which resulted in permanent injuries to Plaintiff.

264. Defendants knew or should have known through testing, scientific knowledge, advances in the field, or otherwise, that Wegovy and/or Zepbound created a risk of serious and potentially irreversible vision issues, sudden vision loss or blindness, severe optic nerve damage, and NAION in one or potentially both eyes.

265. Despite the fact that Defendants knew or should have known that Wegovy and/or Zepbound caused unreasonable and dangerous side effects, they continue to promote and market Wegovy and/or Zepbound without providing adequate clinically relevant information.

266. Defendants knew or should have known that consumers, and Plaintiff specifically, would foreseeably and needlessly suffer injury as a result of Defendants' failures.

267. The Wegovy and/or Zepbound supplied to Plaintiff by Defendants was defective, unreasonably dangerous, and had inadequate warnings or instructions at the time it was sold. Defendants possessed knowledge and information confirming the defective and unreasonably

dangerous nature of Wegovy and/or Zepbound but, despite this knowledge and information, Defendants failed and neglected to issue adequate warnings that Wegovy and/or Zepbound cause serious and potentially irreversible vision issues, optic nerve damage, and NAION. Defendants have yet to issue any warnings or recommendations that patients taking Wegovy and/or Zepbound undergo ophthalmological monitoring.

268. Defendants' failure to provide adequate warnings or instructions rendered Wegovy and/or Zepbound unreasonably dangerous in that it failed to perform as safely as an ordinary patient, prescriber, and/or other consumer would expect when used as intended and/or in a manner reasonably foreseeable by the Defendants, and in that the risk of danger outweighs the benefits.

269. Defendants continue to fail to provide adequate warnings to physicians, pharmacies, and consumers, including Plaintiff and Plaintiff's intermediary physicians.

270. Defendants failed to include adequate warnings and/or provide adequate clinically relevant information and data that would alert Plaintiff and Plaintiff's physicians to the dangerous risks of Wegovy and/or Zepbound including, among other things, potentially irreversible vision issues such as NAION and optic nerve damage.

271. Defendants failed to provide adequate post-marketing warnings and instructions after Defendants knew or should have known of the significant risks of, among other things, potentially irreversible vision issues and optic nerve damage.

272. Defendants continued to aggressively promote and sell Wegovy and/or Zepbound, even after they knew or should have known of the unreasonable risks of potentially irreversible vision issues and optic nerve damage from the drugs.

273. Defendants had an obligation to provide Plaintiff and Plaintiff's physicians with adequate clinically relevant information and data and warnings regarding the adverse health risks

associated with exposure to Wegovy and/or Zepbound, and/or that there existed safer and/or equally effective alternative drug products that do not pose this same risk.

274. By failing to adequately test and research harms associated with Wegovy and/or Zepbound, and by failing to provide appropriate warnings and instructions about use, patients and the medical community, including prescribing doctors, were inadequately informed about the true risk-benefit profile of Wegovy and/or Zepbound and were not sufficiently aware that serious and potentially irreversible vision issues and optic nerve damage might be associated with use of Wegovy and/or Zepbound. Nor were the medical community, patients, patients' families, or regulators appropriately informed that serious and potentially irreversible vision issues and optic nerve damage might be a side effect of Wegovy and/or Zepbound and should or could be reported as an adverse event.

275. The semaglutide and tirzepatide products designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants were defective due to inadequate post-marketing surveillance and/or warnings because, even after Defendants knew or should have known of the risks of severe and permanent vision loss and optic nerve injuries from using Wegovy and/or Zepbound, Defendants failed to provide adequate warnings to users or consumers of the products, and continued to improperly advertise, market, and/or promote them.

276. Wegovy and/or Zepbound is defective and unreasonably dangerous to Plaintiff and other consumers regardless of whether Defendants had exercised all possible care in their preparation and sale.

277. The foreseeable risk of serious and potentially irreversible vision issues and harm to the optic nerve caused by Wegovy and/or Zepbound could have been reduced or avoided by Plaintiff, prescribers, and/or other consumers had Defendants provided reasonable instructions or

warnings of these foreseeable risks of harm.

278. As a direct and proximate result of Defendants' conduct, including the inadequate warnings, lack of information, lack of adequate testing and research, and the defective and dangerous nature of Wegovy and/or Zepbound, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## COUNT II
## STRICT LIABILITY – DESIGN DEFECT
## (Pursuant to Applicable Product Liability Law)

279. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

280. At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Wegovy and/or Zepbound and placed these drugs into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

281. Defendants, as the holders of NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting adverse events, label changes, post-market

surveillance, and pharmacovigilance.

282. Defendants, as manufacturers, designers, distributors, and marketers of pharmaceutical drugs, had a duty to design a product free from a defective condition that was unreasonably dangerous to the Plaintiff.

283. Wegovy and/or Zepbound were designed in a way that posed an unreasonable risk of permanent vision loss and optic nerve injuries and were kept on the market despite being in a defective condition.

284. Defendants knew or should have known the Wegovy and/or Zepbound they developed, manufactured, labeled, marketed, sold, and/or promoted were defectively designed in that they posed a serious risk of severe and permanent vision and optic nerve injuries.

285. Defendants had a continuing duty to design a product that is not unreasonably dangerous to users and to adequately understand, test, and monitor their product.

286. Defendants sold, marketed and distributed products that are unreasonably dangerous for their normal, intended, and foreseeable use.

287. Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed Wegovy and/or Zepbound, defective products which created an unreasonable risk to the health of consumers, and Defendants are therefore strictly liable for the injuries sustained by Plaintiff.

288. The Wegovy and/or Zepbound supplied to Plaintiff by Defendants were defective in design or formulation in that, when they left the hands of the manufacturer or supplier, they were in an unreasonably dangerous and defective condition because they failed to perform as safely as an ordinary consumer would expect when used as intended or in a manner reasonably foreseeable to Defendants, posing a risk of serious and potentially irreversible vision issues and

optic nerve damage to Plaintiff and other consumers.

289. The Wegovy and/or Zepbound taken by Plaintiff was expected to, and did, reach Plaintiff without substantial change in the condition in which it was sold.

290. The Wegovy and/or Zepbound taken by Plaintiff was in a condition not contemplated by the Plaintiff in that it was unreasonably dangerous, posing a serious risk of permanent vision loss and optic nerve damage.

291. Wegovy and/or Zepbound are medications indicated for chronic weight management. Wegovy and/or Zepbound in fact cause serious and potentially irreversible vision issues, severe optic nerve damage, sudden blindness, and NAION, in one or both eyes, harming Plaintiff and other consumers.

292. Plaintiff, ordinary consumers, and prescribers would not expect a drug designed, marketed, and labeled for weight loss and marketed for its supposed health benefits to cause irreversible vision issues and optic nerve damage.

293. The Wegovy and/or Zepbound supplied to Plaintiff by Defendants was defective in design or formulation in that, when it left the hands of the manufacturer or supplier, it had not been adequately tested, was in an unreasonably dangerous and defective condition, and posed a risk of serious and potentially irreversible vision issues and optic nerve damage to Plaintiff and other consumers.

294. The Wegovy and/or Zepbound supplied to Plaintiff by Defendants was defective in design or formulation in that its alleged benefits did not outweigh the risks of serious and potentially irreversible vision issues and optic nerve damage posed by the drug. In light of the utility of the drug and the risk involved in its use, the design of Wegovy and/or Zepbound makes the product unreasonably dangerous.

295. Wegovy and/or Zepbound's design is more dangerous than a reasonably prudent consumer would expect when used in its intended or reasonably foreseeable manner. It was more dangerous than Plaintiff expected.

296. The intended or actual utility of Wegovy and/or Zepbound is not of such benefit as to justify the risk of optic nerve damage that may be irreversible and permanently disabling, thereby rendering the product unreasonably dangerous.

297. The design defects render Wegovy and/or Zepbound more dangerous than other drugs and therapies designed to treat type 2 diabetes and obesity and cause an unreasonably increased risk of injury, including, but not limited to, potentially irreversible vision issues and optic nerve damage.

298. Defendants knew or should have known through testing, scientific knowledge, advances in the field, or otherwise, that Wegovy and/or Zepbound created a risk of serious and potentially irreversible vision issues, severe optic nerve damage, sudden blindness, and NAION in one or both eyes.

299. Wegovy and/or Zepbound are defective and unreasonably dangerous to Plaintiff and other consumers in that, despite knowledge that Wegovy and/or Zepbound use could result in vision issues, Defendants failed to adequately test or study the drugs, including but not limited to: pharmacokinetics and pharmacodynamics of the drugs, their effects on vision and the optic disc, the potential for inter-patient variability, and/or the potential for a safer effective dosing regimen.

300. Defendants acted unreasonably in their design of Wegovy and/or Zepbound in that Defendants failed to adopt a safer design for the product that was practical, feasible, and otherwise a reasonable alternative design or formulation that would have prevented or substantially reduced the risk of harm without substantially impairing the usefulness, practicality, or desirability of the

product.

301. Defendants knew or should have known that consumers, and Plaintiff specifically, would foreseeably and needlessly suffer injury as a result of Wegovy and/or Zepbound's defective design.

302. Wegovy and/or Zepbound is defective and unreasonably dangerous to Plaintiff and other consumers even if Defendants had exercised all possible care in the preparation and sale of these products.

303. As a direct and proximate result of Defendants' conduct, including the inadequate warnings, lack of adequate testing and research, and the defective and dangerous nature of Wegovy and/or Zepbound, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

**COUNT III**
**NEGLIGENT FAILURE TO WARN**

304. Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

305. At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing,

and/or promoting Wegovy and/or Zepbound and placed these drugs into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

306. Defendants, as the holders of the NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

307. Wegovy and/or Zepbound was expected to reach, and did reach, users and/or consumers, including Plaintiff, without substantial change in the defective and unreasonably dangerous condition in which it was sold or distributed.

308. Defendants owed Plaintiff and other Wegovy and/or Zepbound users a duty to exercise reasonable care in marketing, advertising, promoting, distributing and/or selling Wegovy and/or Zepbound.

309. At all times material, Wegovy and/or Zepbound was used in a manner intended and/or foreseeable to Defendants.

310. A reasonable patient or consumer of Wegovy and/or Zepbound would expect the drug to be free of significant defects.

311. Defendants knew or had reason to know of facts establishing that Wegovy and/or Zepbound could cause NAION and failed to warn of the risk.

312. At all times relevant hereto, the defective nature of Wegovy and/or Zepbound was known to Defendants, or reasonably and scientifically knowable to them, through appropriate research and testing by known methods, at the time they distributed, supplied, or sold Wegovy and/or Zepbound, and not known to ordinary physicians who would be expected to prescribe the drug to their patients.

313. In disregard of their duty to timely warn consumers of health risks associated with Wegovy and/or Zepbound, Defendants committed one or more of the following negligent acts or omissions:

a. Failing to properly and adequately warn and instruct Plaintiff and Plaintiff's treating physicians that Wegovy and/or Zepbound were designed and/or manufactured in a way that could cause injuries and damages, including permanent vision loss;

b. Failing to timely disclose to Plaintiff and Plaintiff's prescribing and treating physicians the risk of NAION;

c. Failing to timely warn Plaintiff and Plaintiff's physicians that a baseline eye exam should be performed and monitoring was necessary.

314. At all relevant times, the label for Wegovy and/or Zepbound was inadequate because it did not warn and/or adequately warn of all possible adverse side effects of NAION and permanent vision loss.

315. At all relevant times, the label for Wegovy and/or Zepbound was inadequate because it did not warn and/or adequately warn that Wegovy and/or Zepbound had not been sufficiently and/or adequately tested for safety risks, including NAION.

316. The labels for Wegovy and/or Zepbound were inadequate because they did not warn and/or adequately warn of all possible adverse side effects concerning the failure and/or malfunction of Wegovy and/or Zepbound.

317. Defendants' failure to warn of the above was the proximate cause of Plaintiff's injuries, harm, and economic loss, from which Plaintiff continues to suffer.

318. Defendants' failure to warn of the significant risks of Wegovy and/or Zepbound use prevented Plaintiff and Plaintiff's treating physicians from conducting a proper assessment of the risks and benefits of Wegovy and/or Zepbound.

319. Had Plaintiff and/or Plaintiff's treating physicians been properly warned of the

significant risks of Wegovy and/or Zepbound, Plaintiff would not have elected to begin and/or continue Wegovy and/or Zepbound.

320. Reasonable, safer alternative treatments were available to Plaintiff and/or Plaintiff's treating physicians had they been warned of these significant risks outlined herein.

321. As a direct and proximate result of Defendants' conduct, including the inadequate warnings, lack of adequate testing and research, and the defective and dangerous nature of Wegovy and/or Zepbound, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## COUNT IV
## NEGLIGENCE

322. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

323. At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Wegovy and/or Zepbound and placed these drugs into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

324. Defendants, as the holders of NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

325. At all relevant times, Defendants had a duty to exercise reasonable care in the manufacture, marketing, advertisement, supply, storage, transport, packaging, sale, and distribution of Wegovy and/or Zepbound products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that did not cause users to suffer from unreasonable, dangerous side effects without an adequate warning—when used alone or in foreseeable combination with other drugs.

326. Defendants failed to exercise ordinary care in the labeling, design, manufacturing, testing, marketing, distribution and/or sale of Wegovy and/or Zepbound in that Defendants knew or should have known these drugs created a high risk of unreasonable harm to Plaintiff and other users.

327. Defendants had no reason to believe that intended and foreseeable users of Wegovy and/or Zepbound, such as Plaintiff, would realize the potential harm from use of these products.

328. Defendants failed to exercise reasonable care to inform users, such as Plaintiff, of Wegovy and/or Zepbound's risk of serious and potentially irreversible vision issues and harm to the optic nerve.

329. Defendants breached their duty of care to the Plaintiff and Plaintiff's physicians, in the testing, monitoring, and pharmacovigilance of Wegovy and/or Zepbound.

330. In disregard of their duty, Defendants committed one or more of the following negligent acts or omissions:

a. Manufacturing, producing, overpromoting, formulating, creating, developing, designing, selling, and distributing Wegovy and/or

Zepbound without thorough and adequate pre- and post-market testing of the products;

b. Manufacturing, producing, overpromoting, advertising, formulating, creating, developing, designing, and distributing Wegovy and/or Zepbound while negligently and intentionally concealing and failing to disclose clinical data which demonstrated the risk of serious harm associated with the use of Wegovy and/or Zepbound;

c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Wegovy and/or Zepbound were safe for their intended use;

d. Failing to disclose and warn of the product defect to the medical community and consumers, even though Defendants knew and had reason to know that Wegovy and/or Zepbound were indeed unreasonably unsafe and unfit for use by reason of the product defects and risk of harm to its users;

e. Failing to warn Plaintiff, the medical and healthcare community, and consumers that Wegovy and/or Zepbound's risk of harm was unreasonable and that there were safer and effective alternative products available to Plaintiff and other consumers;

f. Failing to provide adequate instructions, guidelines, and safety precautions to those persons who it was reasonably foreseeable would use Wegovy and/or Zepbound;

g. Advertising, marketing, and recommending the use of Wegovy and/or Zepbound, while concealing and failing to disclose or warn of the dangers known by Defendants to be connected with, and inherent in, the use of this product;

h. Representing that Wegovy and/or Zepbound were safe for their intended use when in fact Defendants knew and should have known the products were not safe for their intended purpose;

i. Continuing to manufacture and sell Wegovy and/or Zepbound with the knowledge that Wegovy and/or Zepbound are unreasonably unsafe and dangerous;

j. Failing to use reasonable and prudent care in the design, research, testing, manufacture, and development of Wegovy and/or Zepbound so as to avoid the risk of serious harm associated with the use of semaglutide and/or tirzepatide. Failing to design and manufacture Wegovy and/or Zepbound so as to ensure these drugs were at least as safe and effective as other similar products;

k. Failing to design and manufacture Wegovy and/or Zepbound so that they were reasonably safe for their intended purpose in violation of objective safety standards;

l. Failing to ensure that Wegovy and/or Zepbound were accompanied by proper and accurate warnings about requiring baseline visual examinations and regular eye examinations while using the drug;

m. Failing to ensure that Wegovy and/or Zepbound were accompanied by proper and accurate warnings about possible adverse side effects associated with the use of Wegovy and/or Zepbound and that use of semaglutide and/or tirzepatide created a high risk of severe, permanent injuries to vision; and

n. Failing to conduct adequate testing, including pre-clinical and clinical testing, and post-marketing surveillance to determine the safety of Wegovy and/or Zepbound.

331. A reasonable manufacturer, designer, distributor, promoter, or seller under the same or similar circumstances would not have engaged in the aforementioned acts and omissions.

332. As a direct and proximate result of the Defendants' negligent testing, monitoring, and pharmacovigilance of Wegovy and/or Zepbound, Defendants introduced products they knew or should have known would cause injury to the optic nerve, NAION and resulting serious and permanent injuries to an individual's vision, and Plaintiff has been injured catastrophically and sustained severe and permanent pain, suffering, disability, and impairment, loss of enjoyment of life, loss of care, comfort, and economic damages.

333. As a direct and proximate result of Defendants' conduct, including the inadequate warnings, lack of adequate testing and research, and the defective and dangerous nature of Wegovy and/or Zepbound, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and

Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## COUNT V
## NEGLIGENT MISREPRESENTATION AND MARKETING

334. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

335. At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Wegovy and/or Zepbound and placed these drugs into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

336. Defendants, as the holders of NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

337. At all relevant times, Defendants negligently provided Plaintiff, Plaintiff's healthcare providers, and the general medical community with false or incorrect information or omitted or failed to disclose material information concerning Wegovy and/or Zepbound, including, but not limited to, misrepresentations regarding the safety and known risks of Wegovy and/or Zepbound.

338. The information distributed by the Defendants to the public, the medical community, Plaintiff and Plaintiff's healthcare providers, including advertising campaigns,

labeling materials, print advertisements, and commercial media, was false and misleading and contained omissions and concealment of truth about the dangers of Wegovy and/or Zepbound.

339. Defendants' conduct had the capacity to deceive, and/or their purpose in making these misrepresentations was to deceive and defraud the public and the medical community, including Plaintiff and Plaintiff's health care providers; to falsely assure them of the quality of Wegovy and/or Zepbound and induce the public and medical community, including Plaintiff and Plaintiff's healthcare providers to request, recommend, purchase, and prescribe Wegovy and/or Zepbound.

340. Defendants' intent and purpose in making these misrepresentations was to deceive and defraud the public and the medical community, including Plaintiff and Plaintiff's health care providers; to falsely assure them of the quality of Wegovy and/or Zepbound and induce the public and medical community, including Plaintiff and Plaintiff's healthcare provider to request, recommend, purchase, and prescribe Wegovy and/or Zepbound.

341. Defendants had a duty to accurately and truthfully represent and market to the medical and healthcare community, Plaintiff, Plaintiff's healthcare providers and the public, the known risks of Wegovy and/or Zepbound, including its propensity to cause permanent vision loss, NAION and injury to the optic nerve.

342. Defendants made continued omissions in the Wegovy and/or Zepbound labeling, including promoting it as safe and effective while failing to warn of its propensity to cause permanent vision loss, NAION and injury to the optic nerve.

343. Defendants made additional misrepresentations beyond the product labeling by representing Wegovy and/or Zepbound as a safe and effective treatment for type 2 diabetes and/or weight loss with only minimal risks.

344. Defendants misrepresented and overstated the benefits of Wegovy and/or Zepbound to Plaintiff, Plaintiff's treaters, and the medical community without properly advising of the known risks of permanent vision loss.

345. In reliance upon the false and negligent misrepresentations and omissions made by the Defendants, Plaintiff and Plaintiff's healthcare providers were induced to, and did, use Wegovy and/or Zepbound, thereby causing Plaintiff to endure severe and permanent injuries.

346. In reliance upon the false and negligent misrepresentations and omissions made by the Defendants, Plaintiff and Plaintiff's healthcare providers were unable to associate the injuries sustained by Plaintiff with Plaintiff's Wegovy and/or Zepbound use before it was too late. Defendants knew or should have known that the Plaintiff, Plaintiff's healthcare providers, and the general medical community did not have the ability to determine the true facts which were intentionally and/or negligently concealed and misrepresented by the Defendants.

347. Plaintiff and Plaintiff's healthcare providers would not have used or prescribed Wegovy and/or Zepbound had the true facts not been concealed by the Defendants.

348. Defendants had sole access to many of the material facts concerning the defective nature of Wegovy and/or Zepbound and its propensity to cause serious and dangerous side effects.

349. At the time Plaintiff was prescribed and administered Wegovy and/or Zepbound, Plaintiff and Plaintiff's healthcare providers were unaware of Defendants' negligent misrepresentations and omissions.

350. The Defendants failed to exercise ordinary care in making representations concerning Wegovy and/or Zepbound while they were involved in their manufacture, design, sale, testing, quality assurance, quality control, promotion, marketing, labeling, and distribution in interstate commerce, because the Defendants negligently misrepresented Wegovy and/or

Zepbound's risk of unreasonable and dangerous adverse side effects.

351. Plaintiff and Plaintiff's healthcare providers reasonably relied upon the misrepresentations and omissions made by the Defendants, where the concealed and misrepresented facts were critical to understanding the true dangers inherent in the use of Wegovy and/or Zepbound.

352. Plaintiff and Plaintiff's healthcare providers' reliance on the foregoing misrepresentations and omissions was the direct and proximate cause of Plaintiff's injuries.

353. As a direct and proximate result of reliance upon Defendants' negligent misrepresentations, Plaintiff suffered bodily injury and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## COUNT VI
## BREACH OF EXPRESS WARRANTY

354. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

355. At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Wegovy and/or Zepbound and placed them into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control

and supervision of Defendants.

356. Defendants, as the holders of NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

357. Defendants expressly warranted to Plaintiff, Plaintiff's healthcare providers, and the general public, by and through Defendants and/or their authorized agents or sales representatives, in publications, labeling, the internet, and other communications intended for physicians, patients, Plaintiff, and the general public, that Wegovy and/or Zepbound were safe, effective, fit and proper for their intended use.

358. Wegovy and/or Zepbound materially failed to conform to those representations made by Defendants, in package inserts and otherwise, concerning the properties and effects of Wegovy and/or Zepbound, which Plaintiff purchased and injected in direct or indirect reliance upon these express representations. Such failures by Defendants constituted a material breach of express warranties made, directly or indirectly, to Plaintiff concerning Wegovy and/or Zepbound sold to Plaintiff.

359. Defendants expressly warranted that Wegovy and/or Zepbound was safe and well-tolerated. However, Defendants did not have adequate proof upon which to base such representations, and, in fact, knew or should have known that Wegovy and/or Zepbound was particularly dangerous to the well-being of Plaintiff and Plaintiff’s vision.

360. Wegovy and/or Zepbound do not conform to those express representations because they are defective, not safe, and have serious adverse side effects.

361. Plaintiff and Plaintiff's physicians justifiably relied on Defendants’ representations regarding the safety of Wegovy and/or Zepbound, and Defendants’ representations became part of

the basis of the bargain.

362. Plaintiff and Plaintiff's healthcare providers justifiably relied on Defendants' representations that Wegovy and/or Zepbound was safe and well-tolerated in their decision to ultimately prescribe, purchase and use the drug.

363. Plaintiff's healthcare providers justifiably relied on Defendants' representations through Defendants' marketing and sales representatives in deciding to prescribe Wegovy and/or Zepbound over other alternative treatments on the market, and Plaintiff justifiably relied on Defendants' representations in deciding to purchase and use the drug.

364. Plaintiff purchased and used Wegovy and/or Zepbound without knowing that the drugs are not safe and well-tolerated, but instead cause significant and irreparable vision loss and eye damage.

365. As a direct and proximate result of Defendants' conduct, including the inadequate warnings, lack of adequate testing and research, and the defective and dangerous nature of Wegovy and/or Zepbound, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

**COUNT VII**
**BREACH OF IMPLIED WARRANTY**

366. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

367. At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Wegovy and/or Zepbound, and placed them into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

368. Defendants, as the holders of NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

369. Defendants were the sellers of Wegovy and/or Zepbound and sold Wegovy and/or Zepbound to be taken for chronic weight management.

370. When Wegovy and/or Zepbound was prescribed by Plaintiff's physician and taken by Plaintiff, the product was being prescribed and used for the ordinary purpose for which it was intended.

371. Defendants impliedly warranted their product, which they manufactured and/or distributed and sold, and which Plaintiff purchased and used, to be of merchantable quality and fit for the common, ordinary, and intended uses for which the product was sold.

372. Defendants breached their implied warranties of the Wegovy and/or Zepbound product because Wegovy and/or Zepbound sold to Plaintiff was not fit for its ordinary purpose to help with weight loss.

373. Wegovy and/or Zepbound would not pass without objection in the trade; they are

not of fair average quality; they are not fit for the ordinary purposes for which the products are used; are not adequately contained, packaged and labeled; and fail to conform to the promises or affirmations of fact made on the container or label.

374. Defendants' breach of their implied warranties resulted in use of an unreasonably dangerous and defective product by Plaintiff, which placed Plaintiff's health and safety at risk and resulted in the damages alleged herein.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## COUNT VIII
## VIOLATION OF GEORGIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT

375. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

376. Plaintiff purchased and used Wegovy and/or Zepbound primarily for personal use and therefore suffered ascertainable losses as a result of Defendants' actions in violation of the Georgia Unfair Trade Practices and Consumer Protection Act.

377. Had Defendants not made affirmative misrepresentations, material omissions, and engaged in the deceptive conduct described herein, Plaintiff would not have purchased Wegovy and/or Zepbound and would not have incurred damages.

378. Defendants engaged in wrongful conduct while at the same time obtaining, under false pretenses, money from Plaintiff that would not have been paid had Defendants not engaged in unfair and deceptive conduct.

379. Despite knowing the falsity and misleading nature of their claims, Defendants engaged in unconscionable commercial practices, deception, fraud, false promise, misrepresentation and/or the knowing concealment, suppression or omission of material facts relative to the safety and efficacy of Wegovy and/or Zepbound.

380. Defendants intended such actions to mislead patients, healthcare providers, and the general public with respect to the safety and efficacy of Wegovy and/or Zepbound.

381. Such actions did, in fact, mislead patients, healthcare providers, and the general public with respect to the safety and efficacy of Wegovy and/or Zepbound.

382. Defendants had a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, labeling, development, manufacture, promotion, and sale of Wegovy and/or Zepbound.

383. Defendants' deceptive, unconscionable, or fraudulent representations and material omissions to patients, physicians and consumers, including MR. COVINGTON, constituted unfair and deceptive acts and trade practices in violation of Georgia Unfair Trade Practices and Consumer Protection Act.

384. As a direct and proximate result of Defendants' conduct, including the inadequate warnings, dilution or lack of information, lack of adequate testing and research, and the defective and dangerous nature of Wegovy and/or Zepbound, WILLIAM COVINGTON suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## COUNT IX
## PUNITIVE DAMAGES

385. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

386. The acts and omissions of Defendants described herein consisted of oppression, fraud, and/or malice, and were done with advance knowledge, conscious disregard of the safety of others, and/or ratification by Defendants' officers, directors, and/or managing agents.

387. Defendants' actions amounted to actual malice or reckless indifference to the likelihood of harm associated with their acts and omissions.

388. Defendants sold Wegovy and/or Zepbound to Plaintiff and other consumers throughout the United States despite their knowledge that Wegovy and/or Zepbound can cause the problems as set forth in this Complaint, thereby causing the severe and debilitating injuries suffered by Plaintiff.

389. Defendants misled both the medical community and the public, including Plaintiff and his physicians, by making false representations about the safety and effectiveness of Wegovy and/or Zepbound and by failing to provide adequate instructions concerning its use.

390. Defendants downplayed, understated, and/or disregarded their knowledge of the serious and permanent side effects and risks associated with the use of Wegovy and/or Zepbound despite available information demonstrating that the drugs could cause NAION and irreversible vision loss.

391. Defendants were or should have been in possession of evidence demonstrating that Wegovy and/or Zepbound use could cause NAION and irreversible vision loss. Nevertheless, Defendants continue to market Wegovy and/or Zepbound by providing false and misleading information with regard to their safety and effectiveness.

392. Defendants failed to provide warnings that would have dissuaded health care professionals from using Wegovy and/or Zepbound, thus preventing health care professionals, including Plaintiff's prescribing physician, and consumers, including Plaintiff, from weighing the true risks against the benefits of using Wegovy and/or Zepbound.

393. As a proximate result of Defendants' acts and omissions, Plaintiff was diagnosed with NAION and suffers from irreparable vision loss due to Plaintiff's use of Wegovy and/or Zepbound.

394. As a result of Plaintiff's injuries, Plaintiff has endured substantial pain and suffering, has incurred significant expenses for medical care, and will remain economically challenged and emotionally harmed.

395. Plaintiff has suffered and will continue to suffer economic loss and has otherwise been emotionally and economically injured.

396. Defendants have engaged in conduct entitling Plaintiff to an award of punitive damages pursuant to common law principles and the statutory provisions of Georgia law.

397. Defendants' actions were performed willfully, intentionally, and with reckless disregard for the rights of Plaintiff and the public.

398. Plaintiff's injuries and damages are severe, permanent and will continue into the future. As a result, Plaintiff seeks actual and punitive damages from the Defendants.

399. Defendants' conduct was committed with knowing, conscious and deliberate

disregard for the rights and safety of consumers, including Plaintiff, thereby entitling Plaintiff to punitive damages in an amount appropriate to punish the Defendants and deter them from similar conduct in the future.

400. Consequently, Defendants are liable for punitive damages in an amount to be determined by the jury.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## EQUITABLE TOLLING OF STATUTES OF LIMITATIONS

401. Defendants are estopped from relying on the statute of limitations defense because Defendants actively concealed information concerning known risks, side effects, and defects in Wegovy and/or Zepbound. Instead of revealing such information to the FDA or the public, Defendants have continued to represent Wegovy and/or Zepbound as safe for its intended use.

402. Defendants are and were under a continuing duty to disclose the true character, quality and nature of risks and dangers associated with Wegovy and/or Zepbound. Because of Defendants' purposeful and fraudulent concealment of material information concerning the true character, quality and nature of risks of such products, Defendants are estopped from relying on any statute of limitations defense.

## DEMAND FOR JURY TRIAL

403. Plaintiff demands a trial by jury on all the triable issues within this pleading.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein, and prays for judgment in his favor and against Defendants awarding the following:

1. A monetary award, sufficient to compensate Plaintiff for the following categories of damages:

   a. actual or compensatory damages in such amount to be determined at trial and as provided by applicable law;

   b. actual and treble damages in such amount to be determined by this Court and as provided by law;

   c. exemplary and punitive damages sufficient to punish and deter Defendants and others from future wrongful practices;

   d. pre-judgment and post-judgment interest;

   e. costs, including court costs and other litigation expenses; and

   f. any other relief the Court may deem just and proper.

Dated: November 6, 2026

Respectfully Submitted,

*/s/ Jason Goldstein*
Jason S. Goldstein, Esq.
Attorney I.D. No. 334857
**PARKER WAICHMAN LLP**
6 Harbor Park Drive
Port Washington, New York 11050
(516) 466-6500
(516) 466-6665
jgoldstein@yourlawyer.com

*Attorney for Plaintiff*